**POMERANTZ LLP**
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
bcalandra@pomlaw.com

*Attorney for Plaintiffs*

*- additional counsel on signature page -*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CONTINENTAL GENERAL INSURANCE COMPANY and PERCY ROCKDALE, LLC, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>SIGURDUR OLAFSSON, BRYAN M. REASONS, and PAUL BISARO,<br><br>     Defendants. | **Case No. 3:23-cv-03662**<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Court-appointed Lead Plaintiffs Continental General Insurance Company and Percy Rockdale, LLC (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants Sigurdur Olafsson, Bryan M. Reasons, and Paul Bisaro, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own

acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Mallinckrodt plc or its various subsidiaries (collectively "Mallinckrodt" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Mallinckrodt securities between June 17, 2022 and August 25, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against certain of Mallinckrodt's top officials.

2.      This action concerns Mallinckrodt, a pharmaceutical company that entered bankruptcy to get out from under billions of dollars in liability for addicting the public to its opioids and improperly billing government entities for Acthar Gel ("Acthar"), a treatment for various autoimmune disorders. Mallinckrodt emerged from bankruptcy pursuant to a Chapter 11 plan that settled the opioid and Acthar actions for payments of billions of dollars over a number of years, reduced the Company's outstanding debt by 30%, and cancelled all of the existing equity shares.

3.      After Mallinckrodt emerged from bankruptcy, its new officers and directors vowed to "deliver value to stakeholders," *i.e.*, increase the Company's share price, to spur investment in the Company and rebuild its reputation. To that end, Defendants repeatedly emphasized that the Company was "emerging from its recent restructuring process with an attractive pipeline, ***enhanced financial flexibility and significant opportunities to drive stakeholder value***" and "***well-positioned for long-term success, with a substantially stronger capital structure*** and major litigation matters permanently resolved."[1]

4.      Defendants repeatedly made these and other assurances to investors for nearly a year after Mallinckrodt emerged from bankruptcy and emphasized that the Company was meeting all of its financial projections and that its financial position

---

[1] All emphasis in quotations is added unless otherwise indicated.

was improving. These assurances culminated in the Company's First Quarter 2023 10-Q, which stated that Defendants "*believe that our sources of liquidity are adequate to fund our operations for the next twelve months and foreseeable future.*"

5.    None of these statements were true. As alleged herein, even though Mallinckrodt was meeting the financial benchmarks set by Defendants, the benchmarks were nowhere near sufficient for the Company to continue making settlement payments in connection with the opioid litigation, pay down its outstanding debt, or continue operating as a going concern. *Less than a month after* Defendants touted that Mallinckrodt had at least a year's worth of liquidity, and with absolutely *no* warning to shareholders, the Wall Street Journal reported that Defendants were readying for a second bankruptcy filing barely a year after the Company had emerged from its first bankruptcy.

6.    Within weeks of the Wall Street Journal article the Company filed a "prepackaged" chapter 11 bankruptcy petition that effectively stiffed opioid victims, handsomely rewarded Defendants, who had concealed the Company's condition, and eviscerated shareholders. Plaintiffs and their fellow class members, who were Mallinckrodt shareholders at the time of the second bankruptcy, bring this action to recover the losses they experienced in reliance on Defendants' egregiously false and misleading statements.

7.      Mallinckrodt was at the epicenter of the epidemic of opioid-related addiction and death that has plagued the U.S. for over a decade. In fact, from 2006 to 2014, Mallinckrodt was the U.S.'s largest opioid producer. As a result of its—often shockingly callous—marketing of opioids, thousands of actions were filed against Mallinckrodt seeking damages for its role in the opioid epidemic.

8.      As the opioid epidemic spiraled out of control, Mallinckrodt was also under investigation by the U.S. Department of Justice for improperly billing the Centers for Medicare & Medicaid Services ("CMS") for Acthar prescriptions. A court eventually found Mallinckrodt liable to CMS for $640 million in damages, and by the fall of 2020 the Company faced hundreds of millions, or even billions, of dollars in additional liability from entities alleging violations of the False Claims Act and other statutes, on top of billions of dollars in opioid liability.

9.      Facing potentially ruinous liability in connection with the opioid and Acthar litigation, Mallinckrodt filed for Chapter 11 bankruptcy in October 2020 (the "First Bankruptcy").

10.     Mallinckrodt exited the First Bankruptcy after negotiating settlements that released all opioid claims against the Company and its debtor subsidiaries in exchange $1.725 billion in deferred payments to a series of claimant trusts (the "Opioid Trusts") over a period of eight years (the "Opioid Settlement"). The Opioid Trusts received $450 million upon Mallinckrodt's emergence from the First

Bankruptcy and were scheduled to receive additional annual installment payments over the next eight years. The First Bankruptcy also settled all government claims relating to Acthar for $260 million in payments over seven years (the "Acthar Settlement") and canceled all shares or other interests in Mallinckrodt at the time the Company entered bankruptcy, leaving all existing shareholders with nothing.

11.    Despite its ongoing financial obligations to the Opioid Trusts, since emerging from Chapter 11 bankruptcy protection, Mallinckrodt has repeatedly assured investors of the Company's financial strength, including purported enhancements to its liquidity and balance sheet, as well as its overall prospects for continued financial stability and near-and-long-term success. Indeed, in the year between Mallinckrodt's emergence from the First Bankruptcy and the filing of the Company's second, prepackaged bankruptcy petition in August 2023 (the "Second Bankruptcy"), Defendants did not make *any* disclosures suggesting that the Company's liquidity or balance sheet was problematic, that it could not make the second scheduled payment to the Opioid Trusts, that it could not fulfill the First Bankruptcy Plan, or that it might not continue operating as a going concern.

12.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. These statements included, among other things, assertions that (i) Defendants were confident that Mallinckrodt had the

6

ability to create value for shareholders after it emerged from the First Bankruptcy; (ii) the Company's operating plan could enable it to fulfill the First Bankruptcy Plan and continue operating as a going concern; (iii) the Company had sufficient liquidity to remain solvent; (iv) the Company's financial performance, which met specific benchmarks and showed improvement, was sufficient to keep operating as a going concern; and (v) advised that bankruptcy concerns were in the past.

13. These statements, as set forth in detail below, were false and misleading because (i) Mallinckrodt had overstated its financial strength, including purported enhancements to its liquidity and balance sheet, following its emergence from Chapter 11 bankruptcy protection; (ii) accordingly, the Company overstated its ability to timely make one or more payments to the Opioid Trusts; (iii) all the foregoing negatively impacted Mallinckrodt's ability and/or willingness to timely meet interest payment obligations on certain bonds; (iv) as a result of all the foregoing, the Company was at an increased risk of having to again file for Chapter 11 bankruptcy protection; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

14. Defendants knew their statements throughout the Class Period were false and misleading because they knew that the Company's performance was far below what was needed to fulfill the First Bankruptcy Plan after they began meeting with an investment banking advisor as early as October 2022 to evaluate

Mallinckrodt's financial condition and conducted a strategic review of the Company's operations from late 2022 to early 2023. Defendants **never** disclosed to investors that this strategic review was in process until after the Company had filed for bankruptcy.

15.    Defendants were incentivized to keep the plates spinning as long as they could—*i.e.*, keep investors in the dark about the Company's future—because they had received millions of dollars in stock grants that would go up in smoke if the Company filed for bankruptcy again. Olafsson had been granted 450,545 Mallinckrodt shares worth $4,580,263, Reasons had been granted 225,273 shares worth $2,290,137, and Bisaro beneficially owned 5,000 shares in the Company. These holdings made up the vast majority of Olafsson's and Reason's compensation, as Olafsson's base salary was $1.1 million, and Reasons' base salary was $600,000.

16.    If Mallinckrodt filed for bankruptcy before these shares vested and/or were sold, however, the shares would be worthless, and Olafsson and Reasons thus **stood to lose approximately 80% of their anticipated compensation**. Defendants thus were heavily incentivized to "keep the plates spinning," *i.e.*, to assure investors that the Company was operating successfully, able to fulfill the First Bankruptcy Plan, and not in danger of filing for bankruptcy, until they could find a way to replace the equity interests that would be obliterated if the Company filed the Second Bankruptcy.

17.    After a year of misrepresentations to investors about the Company's condition, Defendants arranged with certain of Mallinckrodt's creditors to place the Company back into bankruptcy, but still receive bonuses and equity awards that more than compensated for their lost shares.

18.    The truth slowly leaked into the marketplace beginning on June 2, 2023, when *The Wall Street Journal* ("WSJ") reported that Mallinckrodt was again exploring bankruptcy as its next $200 million payment to the Opioid Trusts came due. On this news, Mallinckrodt's ordinary share price fell $0.98 per share, or 40%, to close at $1.47 per share on June 5, 2023, the next trading day.

19.    On June 15, 2023, Mallinckrodt disclosed in an SEC Form 8-K filing (the "June 15 8-K") that it had determined not to make interest payments on two bonds due that day and may need to file for bankruptcy, and on this news, Mallinckrodt's ordinary share price fell $0.39 per share, or 30.95%, to close at $0.87 per share on June 15, 2023.

20.    On June 23, 2023, Mallinckrodt filed another SEC Form 8-K (the "June 23 8-K") in which the Company disclosed that "[o]n June 14, 2023"—the day prior to the June 15 8-K—"the Board approved a variety of actions and programs focused on executive retention and incentive matters" in anticipation of a potential bankruptcy filing. These "actions and programs" were nothing more than a reward to Defendants for misrepresenting the Company's ability to fulfill the First

Bankruptcy Plan and continue operating as a going concern. Rather than suffer any financial consequences in the bankruptcy, Defendants received retention bonuses, additional financial compensation, and shares in the Mallinckrodt entity that emerged from the Second Bankruptcy to replace the millions of dollars in shares they lost.

21.     On June 21, 2023, Mallinckrodt filed another SEC Form 8-K ("June 23 8-K") in which the Company disclosed that "[o]n June 14, 2023" – the day prior to the June 15 8-K – "the Board approved a variety of actions and programs focused on executive retention and incentive matters" in anticipation of a potential bankruptcy filing. In other words, investors learned for the first time that if the Company did ultimately file for bankruptcy, Defendants would not suffer any financial consequences for the Company's collapse. Instead, Defendants had arranged to receive monetary bonuses and equity in the Company that emerged from a second bankruptcy. Investors had not only learned the truth of the Company's inability to fulfill the First Bankruptcy Plan and operate as a going concern, but also that Defendants were insulated from any losses in connection with their failure to disclose the truth. On this news, Mallinckrodt's ordinary share price fell $0.24 per share, or 15.6%, to close at $1.29 per share on June 22, 2023.

22.     On August 23, 2023, before the market opened, Mallinckrodt announced the signing of a restructuring support agreement and an agreement to file

a "prepackaged" bankruptcy. A prepackaged bankruptcy is a bankruptcy where a chapter 11 plan is negotiated with certain creditors before the bankruptcy is filed. The filing includes a bankruptcy plan and the creditors frequently commit to support the plan as part of the negotiations. Prepackaged bankruptcies take **_months_** to negotiate. For example, in a recent a prepackaged bankruptcy filed in May 2023, negotiations with creditors took **_18 months_** before the prepackaged bankruptcy was filed.[2] Accordingly, Defendants undoubtedly had been working with creditors long before the June 2, 2023 Wall St. Journal article disclosed that a bankruptcy filing could be imminent.

23.    Early in the morning of Monday, August 28, 2023, before markets opened, Mallinckrodt announced that it had filed the Second Bankruptcy and trading was halted in Mallinckrodt's shares on the NYSE American. The Company's share price at the close of the prior trading day, Friday, August 25, 2023, was $0.34 per share. Accordingly,  the Company's shares lost all their value, and were worthless.

24.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

---

[2] *See In re Monitronics Security, LP*, 23-bk-90331 (Bankr. S.D. Tex.).

## JURISDICTION AND VENUE

25.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

26.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

27.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).    Pursuant to Mallinckrodt's most recent annual report on Form 10-K, as of February 24, 2023, there were 13,170,932 of the Company's shares outstanding. Mallinckrodt's ordinary shares trade in the U.S. on the NYSE American ("NYSE").    Accordingly, there are presumably hundreds, if not thousands, of investors in Mallinckrodt's ordinary shares located in the U.S., some of whom undoubtedly reside in this Judicial District.

28.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

29.    Plaintiffs, as set forth in their certification filed in this action,[3] acquired Mallinckrodt securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

30.    Defendant Sigurdur Olafsson ("Olafsson") has served as Mallinckrodt's Chief Executive Officer ("CEO"), President, and a member of its board of directors (the "Board") since June 25, 2022.

31.    Defendant Bryan M. Reasons ("Reasons") has served as Mallinckrodt's Executive Vice President and Chief Financial Officer ("CFO") at all relevant times.

32.    Defendant Paul Bisaro ("Bisaro") has served as the Chairman of Mallinckrodt's Board at all relevant times.

33.    Bisaro and Olafsson are old colleagues and friends, having previously worked together at Watson Pharmaceuticals ("Watson"), where Bisaro served as CEO. At the start of the conference call to announce Mallinckrodt's financial performance for the second quarter of 2022 (the "Q2 2022 Call"), which was Olafsson's first such call as Mallinckrodt's CEO, Olafsson emphasized his close working relationship with Bisaro at Watson. Olafsson apprised call attendees that "[u]nder [Bisaro's] visionary leadership, we transformed [Watson] into a global-

---

[3] *See* ECF No. 9-3 at 10-14.

branded pharmaceutical leader." According to Olafsson, his experience with Bisaro "will be deeply beneficial to our work to put Mallinckrodt on the path to long-term value creation."

34.    Defendants possessed the power and authority to control the contents of Mallinckrodt's SEC filings, press releases, and other market communications. Defendants were provided with copies of Mallinckrodt's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions at Mallinckrodt and their access to material information available to them but not to the public, Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that Defendants' positive representations were materially false and misleading.  Defendants thus are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### A. Background

35.    Mallinckrodt plc was incorporated in Ireland on January 9, 2013. Mallinckrodt plc is the parent company of a global pharmaceutical business consisting of multiple wholly owned subsidiaries, which are referred to herein collectively as "Mallinckrodt" or the "Company." The Company's principal

executive offices are at College Business & Technology Park, Cruiserath, Blanchardstown, Dublin 15, Ireland, and its corporate shared services office is in Hazelwood, Missouri.

36.     After the Company filed for bankruptcy October 12, 2020, its ordinary shares traded in an efficient market on the over-the-counter market ("OTC") under the ticker symbol "MNKPF." From October 2022 until August 28, 2023, the Company's shares traded in an efficient market on the NYSE American exchange, under the ticker symbol "MNK." Trading in the Company's shares was suspended on August 28, 2023, when, as alleged in more detail below, the Company filed for bankruptcy for a second time. The Company's shares were formally delisted from the NYSE American exchange on September 16, 2023, and have since traded in an efficient market on the OTC under the ticker symbol "MNKTQ."

37.     Mallinckrodt is in the business of developing, manufacturing, marketing, and distributing specialty pharmaceutical products and therapies. The Company employs approximately 2,700 people internationally.

38.     The Company is divided into two business segments, its Specialty Brands Division ("Specialty Brands") and Specialty Generics Division ("Specialty Generics"). The commercial headquarters for Specialty Brands is in Bridgewater, New Jersey, and its Specialty Generics headquarters and technical development center is in Webster Groves, Missouri.

39.     Specialty Brands focuses on drugs for autoimmune and rare diseases in areas like neurology, rheumatology, hepatology, nephrology, pulmonology, ophthalmology, and oncology, immunotherapy, and neonatal respiratory critical care therapies, analgesics, cultured skin substitutes, and gastrointestinal products. Specialty Brands' flagship product is Acthar Gel ("Acthar"), a drug used to treat multiple rare autoimmune diseases. For a period of time Acthar was Mallinckrodt's most important product, generating nearly $6 billion in net sales between 2014 and 2019 and comprising approximately one-third of the company's annual net sales in 2017, 2018, and 2019.

40.     Specialty Generics consists of over twenty specialty generic product families for pain management, substance abuse disorders, and ADHD. Its core products are opioids, ADHD medications, addiction treatments and APIs.

41.     As set forth below, Mallinckrodt's well-publicized misconduct in the distribution and sales of its opioids and Acthar led to billions of dollars in settlements against the Company. The misconduct, which truly shocks the conscience, directly contributed to both the First and Second Bankruptcies.

**B. <u>Mallinckrodt's Role in the Opioid Crisis</u>**

42.     Opioids are a class of narcotic painkilling drugs that are either derived from opium or have effects similar to opium. While "opiates" are generally opium-

derived drugs such as morphine, codeine, and heroin, "opioids" differ from opiates and are newer, mostly synthetic drugs like oxycodone, hydrocodone, and fentanyl.

43.    In the mid-to-late 1990s, opioid manufacturers and distributors, including Mallinckrodt, developed and began to market powerful synthetic opioids. To promote these products, Mallinckrodt and other opioid manufacturers and distributors, including Purdue Pharma Inc. ("Purdue"), Johnson & Johnson ("J&J"), Endo International plc ("Endo"), Teva Pharmaceutical Industries, Limited ("Teva"), and Allergan plc ("Allergan"), among others embarked upon a marketing and promotional campaign to intentionally create a misperception of the danger and addictive quality of opioids. These opioid manufacturers and distributors sought to convince physicians and other healthcare professionals that opioids were safe and effective treatments for chronic pain.

44.    This campaign by Mallinckrodt and other companies in the opioid industry to push healthcare providers to prescribe opioids was a stunning success. According to one study, prescriptions for pain medications increased by 73% between 2000 and 2010, even though over that period the number of visits to physicians for pain-related issues did not increase and prescriptions for non-opioid pain medications decreased. Although opioid prescriptions peaked in approximately 2012, when more than 280 million prescriptions were issued (roughly a one-month supply for every American adult), opioid prescription levels have remained

astonishingly high. In this Judicial District, which covers the State of New Jersey, for example, there were a total of approximately 34,620,760 opioid prescriptions dispensed between 2013 and 2019. In fact, there were 1,486,295 opioid prescriptions dispensed in New Jersey alone between January 1, 2020, and May 31, 2020.

45.    The success of Mallinckrodt and its peer companies at convincing physicians to prescribe opioids came at a terrible cost to public health (the "Opioid Crisis"). Nearly 450,000 people in the United States died from overdoses involving any opioid, including prescription and illicit opioids, from 1999 to 2018. In 2014, 47,000 Americans died from drug overdose deaths attributable to prescription opioids or heroin (which is often used as a cheaper substitute for opioids by addicts who can no longer afford prescriptions). The following year, in 2015, more than 52,000 Americans died of drug overdoses. In 2016, nearly 64,000 drug overdose deaths outnumbered every other cause of accidental fatalities. In 2018, there were 67,367 drug overdose deaths in the U.S., 46,802 (or 69.5%) of which directly involved opioids.

46.    New Jersey saw a wave of overdoses during this time as well. Between 2013 and 2019 there were 15,324 suspected overdose deaths in the state. Indeed, the horrific death toll continued: there were over 1,339 suspected overdose deaths in New Jersey from January 1, 2020, to May 31, 2020.

47.    Mallinckrodt employees were shockingly callous as they pushed opioids to the public. For example, in September 2019, the Washington Post published a January 2009 email exchange between a national account manager for an opioid manufacturer at Mallinckrodt and a vice president for an opioid distributor. When the Mallinckrodt account manager emailed the vice president that 1,200 bottles of opioids had been shipped, the vice president responded "***It's like people are addicted to these things or something. Oh, wait, people are***," and the account manager replied: "***Just like Doritos keep eating, we'll make more***."

48.    Between 2006 and 2014, Mallinckrodt manufactured 2.3 billion opioid pills, making it the single largest producer in the U.S. during that period, according to the U.S. Drug Enforcement Agency.

49.    Beginning in 2018, Mallinckrodt began to face a litany of lawsuits from state attorneys general who claimed that the Company had understated how addictive its pain pills were. In fact, more than 3,000 lawsuits from states, Native American tribes and counties alleged the drugmakers, pharmacies and distributors played down the risk of painkillers and didn't stem their flow (the "Opioid Actions"). These actions presented an existential threat to Mallinckrodt, which in October 2022 sought bankruptcy protection to manage its exposure.

C. **Mallinckrodt Sales of Acthar Shortchange the Federal Government**

50.    The pervasive misconduct at Mallinckrodt did not stop at addicting millions to opioids. Before it filed for bankruptcy in October 2022, and during the pendency of that bankruptcy, Mallinckrodt was under investigation by multiple federal agencies, including the SEC, U.S. Attorney's Office for the District of Massachusetts ("USAO"), and other state and federal attorneys general.

51.    According to a settled administrative proceeding filed by the SEC in November 2023 (the "SEC Action"),[4] in April 2016, the United States Centers for Medicare and Medicaid Services ("CMS") notified Mallinckrodt that the Company had been overcharging Medicaid for Acthar. Specifically, CMS notified Mallinckrodt that the Company's basis for a rebate rate for Acthar was incorrect. Correcting the rebate calculation in 2016 would have created an approximate $250 million liability for Mallinckrodt to account for years of rebate underpayments. It also would have reduced future net sales of Acthar by approximately $90 to $100 million annually. Mallinckrodt did not disclose the letter, the alleged overbilling, or the potential effect on Acthar sales to investors.

---

[4] Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8a of the Securities Act of 1933 and Section 21c of The Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order, *In the Matter of Mallinckrodt plc*, No. 3-21806 (Nov. 30, 2023).

52.     After Mallinckrodt refused to correct the rebate rate, CMS sent a letter to Mallinckrodt in November 2018 directing it to correct the rebate rate, which the Company again failed to disclose to investors.

53.     By January 2019, Mallinckrodt's potential liability for CMS's claim had grown to more than $500 million, and the USAO issued Mallinckrodt a civil investigative demand ("CID") under the False Claims Act ("FCA"), requesting, among other things, documents related to the reset of the Acthar rebate rate in 2012, Mallinckrodt's calculation of Acthar rebates in the Medicaid Drug Rebate Program ("MDRP"), and communications with the government about the rebate rate (the "FCA Investigation").

54.     Eventually, in May 2019, Mallinckrodt belatedly filed a Form 8-K disclosing the Acthar rebate dispute with CMS and that the Company had filed a lawsuit seeking to prevent CMS from removing Acthar from the MDRP or changing its rebate calculation (the "CMS Action"). In March 2020, the USAO unsealed a complaint against Mallinckrodt alleging years of FCA violations.

55.     In 2020, Mallinckrodt lost its lawsuit against CMS when the trial court granted the U.S. government summary judgment.[5] As it appealed that loss, the Company recorded a $640 million liability. A class action arising out of

---

[5] See Mallinckrodt ARD LLC v. Verma, 444 F. Supp. 3d 150 (D.D.C. 2020).

21

Mallinckrodt's misrepresentations to investors about Acthar recently survived a motion to dismiss and is now in discovery.[6]

**D. <u>The First Bankruptcy</u>**

56.    In its quarterly report for the second quarter of 2020, filed on August 4, 2020, Mallinckrodt disclosed that the liability it faced in the CMS Action and the Opioid Actions "raised substantial doubt about the Company's ability to continue as a going concern."

57.    On October 12, 2020, Mallinckrodt plc and substantially all of its U.S. subsidiaries at that time (collectively, the "First Bankruptcy Debtors")[7] filed for bankruptcy (the "First Bankruptcy") in the U.S. Bankruptcy Court for the District of Delaware (the "First Bankruptcy Court").

58.    In the First Bankruptcy, Mallinckrodt proposed a plan that it claimed would allow it to continue as a going concern while making a significant payment to victims of the Opioid Crisis (the "First Bankruptcy Plan"). The First Bankruptcy Plan, among other things:

---

[6] *See Strougo v. Mallinckrodt Pub. Ltd. Co.*, 2022 WL 17740482, at *1 (D.N.J. Dec. 16, 2022).

[7] *See In re Mallinckrodt plc*, No. 20-12522 (Bankr. D. Del.). As described herein and in Exhibit A to this consolidated complaint, the First Bankruptcy Debtors are the same entities as the Second Bankruptcy Debtors, except for three Mallinckrodt plc subsidiaries.

a. Released all opioid claims against the First Bankruptcy Debtors in exchange for $1.725 billion in deferred payments to a series of claimant trusts (the "Opioid Trusts") over a period of eight years (the "Opioid Settlement"). The Opioid Trusts received $450 million upon Mallinckrodt's emergence from the First Bankruptcy and were scheduled to receive annual installment payments over the next eight years, including $200 million payments on the first and second anniversaries of Mallinckrodt's emergence from the First Bankruptcy (the "Opioid Payments"). Mallinckrodt also had an option to fully pay—or pre-pay—the outstanding balance of the Opioid Settlement at a discount.

b. Settled all government claims relating to Acthar, including the CMS Action and the FCA Investigation (but excluding the SEC Action), for $260 million in payments over seven years, of which $15 million was paid immediately (the "Acthar Settlement").

c. Canceled all shares or other interests in Mallinckrodt at the time the Company entered bankruptcy, leaving all existing shareholders in Mallinckrodt plc with nothing.

59.    Accordingly, under the First Bankruptcy Plan, (i) victims of the Opioid Crisis permanently surrendered their legal rights to pursue opioid-related litigation against Mallinckrodt, and the Company could continue manufacturing opioids; (ii) the U.S. government negotiated down its claim for approximately $640 million in the CMS Action, FCA actions pending in Massachusetts and Pennsylvania (which could result in trebled damages awards against the Company) were resolved, and state and territory attorneys general dismissed related lawsuits; and (iii) Mallinckrodt's existing shareholders were entirely wiped out.

60.    The First Bankruptcy Plan also called for the following reduction of the Company's debt:

| Pre-petition Capital Structure | | Reorganized Capital Structure | |
|---|---|---|---|
| First Lien Revolving Credit Facility Claims | $900 million | First Lien Notes | $650 million |
| First Lien Term Loan Claims | $1.763 billion | New Take Back Loan Facility | $1.763 billion |
| First Lien Notes Claims | $505 million | First Lien Secured Notes | $495 million |
| Second Lien Notes Claims | $330 million | Second Lien Secured Notes | $323 million |
| Guaranteed Unsecured Notes | $1.696 billion | Takeback Second Lien Notes | $375 million |
| | $5.194 billion | | $3.606 billion |

61.     Although the First Bankruptcy Plan appeared to be a fantastic result for the Company in that untold billions in liability for its opioid and Acthar misconduct were reduced to under $2 billion, and $5.2 billion of the Company's existing debt was reduced by 30.6% to $3.6 billion, the Company was still saddled with payment obligations of over $5.6 billion. Mallinckrodt thus needed to convince the First Bankruptcy Court to approve the plan.

62.     In considering whether to approve the First Bankruptcy Plan, the First Bankruptcy Court held sixteen days of hearings between November 2021 and January 2022.

63.     During those hearings, Randall Eisenberg of Alix Partners, Mallinckrodt's CRO in the First Bankruptcy, testified extensively. On December 9, 2021, Eisenberg testified unequivocally that the Plan would maximize value for stakeholders receiving distributions, was not likely to be followed by liquidation or a need for further reorganization, and post-restructuring, the reorganized debtor will not be left with an unreasonably small amount of capital to operate.

64.     Eisenberg based his testimony on financial projections for Mallinckrodt that were issued in September 2021 (the "First Plan Forecasts").[8] The First Plan Forecasts projected net sales for the Company of $2.2 billion to $2.4 billion for the years 2022 to 2025 and adjusted earnings before interest, depreciation, taxes and amortization ("EBIDTA") of $791 million to $820 million over that same period.

65.     Based on Eisenberg's testimony, on February 3, 2022, the Bankruptcy Court confirmed the First Bankruptcy Plan.

66.     As an Irish company, Mallinckrodt needed the equivalent of approval from Irish authorities before the First Bankruptcy Plan went into effect. On April 27, 2022, the High Court of Ireland confirmed a scheme of arrangement, and Mallinckrodt emerged from the First Bankruptcy on June 16, 2022.

---

[8] *See* Mallinckrodt plc, Current Report (Form 8-K) (Oct. 26, 2021), Exh. 99.1.

67.     Upon officially emerging from the First Bankruptcy Mallinckrodt made its initial payments to the Opioid Trusts and in connection with the Acthar settlements. After those payments, the Company owed $1.535 million in settlement payments and had $3.606 billion in debt.

### E. Mallinckrodt Emerges From the First Bankruptcy

68.     Virtually from the moment Mallinckrodt emerged from the First Bankruptcy, Defendants assured investors of the Company's financial strength, including purported enhancements to its liquidity and balance sheet, as well as its overall prospects for continued financial stability and near-and-long-term success. These assurances, which continued throughout the Class Period, were designed to attract investors to the Company's common stock by assuring those investors that the Company could fulfill the First Bankruptcy Plan and was not at risk of a second bankruptcy filing, which would wipe out any purchases of Mallinckrodt stock.

69.     Defendants had an especially strong motive to convince investors to purchase Mallinckrodt stock because substantial portions of their compensation were directly tied to that stock. For example, based on Mallinckrodt's 2023 proxy statement, Olafsson had received a grant of 450,545 shares worth $4,580,263, Reasons had received 225,273 shares worth $2,290,137, and Bisaro beneficially owned 5,000 shares in the Company. These holdings made up the vast majority of Olafsson's and Reason's compensation, given that in 2022 Olafsson's base salary

was $1.1 million, Reasons' base salary was $600,000. If Mallinckrodt filed for bankruptcy before these shares vested and/or were sold, however, the shares were worthless, and Olafsson and Reasons thus **_stood to lose approximately 80% of their anticipated compensation_**. Defendants thus were heavily incentivized to "keep the plates spinning," *i.e.*, to assure investors that the Company was operating successfully, able to fulfill the First Bankruptcy Plan, and not in danger of filing for bankruptcy, until they could find a way to replace the equity interests that would be obliterated if the Company filed the Second Bankruptcy.

70.    Defendants thus made statements throughout the Class Period assuring investors that the Company was solvent, meeting or exceeding expectations, and thus able to fulfill the First Bankruptcy Plan and not in danger of filing for bankruptcy again. Indeed, Defendants' positive assurances to investors continued until late in the Class Period, when, after ensuring that they would receive bonus payments exceeding their salary and substantial equity stakes in Mallinckrodt, Defendants abruptly reversed course and stunned investors with the news that Mallinckrodt was returning to bankruptcy barely a year after it emerged from the First Bankruptcy.

71.    For example, On June 16, 2022, Mallinckrodt issued a press release during after-market hours, entitled "Mallinckrodt Emerges from Chapter 11 with Strengthened Balance Sheet and Enhanced Financial Flexibility" (the "June 2022

Release"). In that release, Olafsson assured investors that "Mallinckrodt is emerging from its recent restructuring process with an attractive pipeline, ***enhanced financial flexibility and significant opportunities to drive stakeholder value***." The June 2022 Release also quoted Bisaro, who assured investors that "Today marks a new beginning for Mallinckrodt as ***we emerge well-positioned for long-term success, with a substantially stronger capital structure*** and major litigation matters permanently resolved."

72.    Similarly, on August 11, 2022, Defendants held the Q2 2022 Call. After introducing himself as the Company's new President and CEO, Olafsson touted Mallinckrodt's financial strength, tell attendees that "[a] lot of work has been done already to establish a strong foundation in the business, ***which is underpinned by significant liquidity, meaningful cash flows from operation, a solid U.S. commercial platform*** and competitive positioning in critical care and immunology." Later in the call, Olafsson again assured investors, "I wouldn't be here speaking with you today [if I] ***didn't have every confidence in Mallinckrodt's ability to create value for shareholders*** and make a positive impact on patients' lives every day."

73.    Defendants' assurances continued on November 8, 2022, when they held a conference call for analysts and investors to report on the Company's financial performance for the third quarter of 2022 (the "Q3 2022 Call"). As with the Q2 2022 call, Olafsson had nothing but positive things to say about Mallinckrodt, effusing

that "*[m]y first full quarter as a CEO reinforced my confidence in Mallinckrodt and the ability of our talented employees to build a great business focused on improving the lives of patients* . . . 2023 will be an important year for Mallinckrodt and *I believe we have the right plan in place to move forward successfully*."

74.    Also on the Q3 2022 call, Olafsson expressly informed investors that Acthar, one of the Company's most important products, was performing as the Company forecast when it emerged from bankruptcy. Olafsson said, "[w]e are encouraged to see early signs of demand stabilization for Acthar Gel and performance in the quarter was consistent with our expectations." This was true, according to Olafsson, even though "a regulatory matter involving one of our partners" had affected the launch of an injection device for Acthar, and thus "we do not anticipate the launch [of the device] in 2023. We will continue to provide updates as our partner works towards a resolution."

75.    Later during the Q3 2022 call, Reasons underscored Olafsson's positivity by assuring investors that the Company's total net sales "*were largely in line with our expectations*." He continued, "[d]uring the quarter Acthar Gel contributed $126 million in net sales, *which was consistent with our expectation* and underscores our confidence that the asset to drive approximately $500 million in net sales in 2022."

76.    To make sure there was no misunderstanding, Olafsson continued the Q3 2022 Call by emphasizing the Company's positive performance and financial position to investors:

> I want to reiterate my belief that Mallinckrodt today **has a strong foundation underpinned by significant liquidity, meaningful cash flows from operations**, a solid U.S. commercial platform, and competitive positioning in critical care and immunology . . . . **We're exactly where we said we would be last quarter and expect to deliver on our guidance for the full year. By executing on near term priorities, continuing to re-energize our organization, and delivering for stakeholders Mallinckrodt has a strong future ahead developing therapies designed to improve outcomes for patients**.

77.    Defendants' positive statements continued into 2023. On February 28, 2023, Mallinckrodt issued a press release announcing its fourth quarter and fiscal year 2022 financial results (the "2022 Release"). In the FY22 Release, Olafsson touted that the Company "**finished 2022 by exceeding our EBITDA guidance and achieving the high end of our net sales guidance for the year**. **We also increased cash on hand**, reflecting our ongoing efforts to strengthen the balance sheet and optimize our cost structure," and assured investors that "**Mallinckrodt is well-positioned to stabilize the business in the near term and achieve sustainable growth in the long term**."

78.    In addition, that same day, Defendants held a call with investors to report the Company's 2022 full-year financial results (the "FY 2022 Call"). Olafsson began that call by reiterating that Mallinckrodt "**executed well and I'm incredibly**

*proud of how we finished the year, exceeding our EBITDA guidance and achieving the high end of net sales guidance for the year*," and "*I wanted to kick things off with these positive results as they tie directly back to our strategic initiatives*." In other words, according to Olafsson, the Company's performance was a direct result of plans implemented when the Company emerged from the First Bankruptcy.

79.    Later during the FY 2022 Call, Olafsson touted to investors that Mallinckrodt had more money in the bank, saying, "[w]e . . . saw a slight increase in cash in hand during the fourth quarter and *believe our liquidity will allow us to continue making important investments in the business*."

80.    Olafsson further assured that while "2023 is a pivotal year for the company," "*we stand ready to navigate the opportunities and the challenges we have ahead of us*. I am pleased with our efforts today and *I have a great confidence in Mallinckrodt's long-term ability to drive value for stakeholders*."

81.    Later on the FY 2022 Call, Olafsson further advised investors that, "[w]e have some real opportunities ahead," and continued, "*we are prepared to face challenges this year* [and] on, including the loss of royalty due to generate competition in the U.S. for Amitiza *and Acthar competition*. While there are some clear challenges to the business, *I believe we are taking the right steps to mitigate*

*these operational impacts, and we are seeing encouraging sign across both business segments*."

82.    Incredibly, Reasons suggested during the FY 2022 Call that Mallinckrodt's performance had been so strong that Defendants were considering pre-paying the amounts owed to the Opioid Trusts in connection with the Opioid Settlement. A representative of Brean Asset Management observed during the FY 2022 Call, "I believe there was an 18-month extension opportunity to prepay" the amounts owed by Mallinckrodt in connection with the Opioid Settlement. The representative then asked, "I wanted to know how you guys are thinking about that in concurrence with opportunities to buyback debt."

83.    Far from suggesting that the Company could not afford to make the upcoming opioid payment, Reasons hinted that the Company could pre-pay it:

> Look, when we negotiated that, we had -- we put in an 18-month period that we could prepay that at a significant discount. Clearly, the capital markets shifted since then. So, we still have that opportunity, but we're looking at the capital structure holistically monitoring the capital markets. *So, from a capital allocation, if that's the best return on our use of liquidity, we'll do that. But certainly, delevering in other areas of our cap structure have become very attractive as well right now*. So—but we have 18 months from emergence to capture that discount.

84.    Defendants' touting of the Company's financial health continue in April 2023. The Company's 2023 proxy statement reiterated how the "emergence from Chapter 11 proceedings enables us to move forward as a diversified global specialty pharmaceutical company with a strengthened balance sheet and increased

financial flexibility to invest in our business, execute our strategic initiatives, advance our pipeline and better meet the needs of patients."

85.    The following month, in May 2023, Defendants continued assuring investors that the Company was meeting all expectations, performing consistently with its forecasts, increasing cash on hand, and thus able to fulfill the First Bankruptcy Plan and not at risk of re-entering bankruptcy.

86.    In a May 9, 2023, call to disclose the Company's first quarter 2023 performance to investors (the "Q1 2023 Call"), Olafsson stated that Mallinckrodt "*again increased [its] cash on hand, demonstrating that disciplined cost management* and strengthening the balance sheet are top of mind in every decision we make" and that touted that "[i]t is great to see further improvement on this front."

87.    Olafsson continued, "*[w]e remain confident in Acthar's long-term prospects*, and we'll also continue to drive the submission of the Acthar next-generation delivery device, pending resolution of third-parties regulatory matters we have previously mentioned." Olafsson further assured investors that "while performance was essentially flat in the quarter from last year, *we still anticipate the product will see sequential net sales growth throughout the year as it returns to a historical mid-single digit growth rates*."

88.    On that same call, Olafsson touted that "Specialty Generics was a strong performer in first quarter, achieved double-digit growth versus the prior year

and continued to be an integral part of the Mallinckrodt's business and an important diversification driver." He further informed investors that "*we are pleased to be able to reaffirm our full year net sales and adjusted EBITDA guidance despite the softer than expected Acthar performance*."

89.     Olafsson did acknowledge on the call that, "[f]or Acthar, we now expect the sales to decline between 15% to 20% in 2023," but did not caution investors that this decline threatened Mallinckrodt's ability to fulfill the First Bankruptcy Plan or continue operating as a going concern. Instead, Olafsson said just the opposite: "*[h]aving a well diversified business allows us to manage through these challenges and remain on track to deliver on our expectation and our strategic goals*." He continued, "[w]hile we still have to work – while we still have work to do, *our progress to date reinforces my confidence in Mallinckrodt's ability to drive a long-term value* while continuing to deliver for our patients."

90.     Olafsson concluded the Q1 2023 Call on a high note, telling investors that "*Mallinckrodt began the year well and I'm confident that we will continue to make good progress throughout 2023*. I can personally attest to the strides we have made across the company to put the business into a stronger position for the future. While we need to stay intensely focused on our goals and priorities, it gives me a great pride to see what our teams have already achieved. I look forward to all that we will accomplish the remainder of the year for our patients and each other."

91.    Olafsson's positive outlook was reaffirmed in Mallinckrodt's quarterly report on Form 10-Q for the first quarter of 2023, which was filed on May 9, 2023, and signed by Reasons (the "Q1 2023 10-Q"), and stated that Defendants "believe that *our sources of liquidity are adequate to fund our operations for the next twelve months and foreseeable future*." Defendants simply could not have believed this, however, because, according to a declaration filed in the Second Bankruptcy by Jason Goodson, Mallinckrodt's Executive Vice President and Chief Strategy and Restructuring Officer (the "Goodson Declaration"), at essentially the same time Defendants were making these statements, "the Company was presently insolvent comparing its value as a going concern to the face amount of its debt and settlement obligations."

92.    As set forth above, ***nothing*** in Defendants' statements from the time the Company emerged from the First Bankruptcy in June 2022 through and including the Q1 2023 Release, Q1 2023 Call, and Q1 2023 10-Q gave investors ***any*** indication that the Company was unable to meet its obligations under the First Bankruptcy Plan (including payments to the Opioid Trusts), on the brink of re-entering bankruptcy, or insolvent. The message to shareholders was the exact opposite: the Company was exceeding the performance forecasted when the Company emerged from the First Bankruptcy, had accrued tens of millions of dollars in cash during the prior year,

was considering pre-paying debt or amounts owed to the Opioid Trust, and had sufficient funds to operate for at least another year.

93.    Plaintiffs, Mallinckrodt's shareholders, and the market at large were thus stunned when within weeks of Defendants' latest positive statements in May 2023, the Company disclosed that it would not make its next scheduled payment to the Opioid Trusts, was negotiating a prepackaged Chapter 11 bankruptcy filing (the "Second Bankruptcy") and was insolvent.

## F. **The Second Bankruptcy**

94.    Mallinckrodt had made its first payment of $450 million to the Opioid Trusts as it emerged from the First Bankruptcy in June 2022. The Company's next payment of $200 million was due in June 2023.

95.    Although Defendants had assured investors that the Company would make its next payment to the Opioid Trusts, on June 2, 2023, during after-market hours, and less than a month since Mallinckrodt reaffirmed its full-year 2023 financial guidance, the WSJ published an article, titled "Mallinckrodt Explores Repeat Bankruptcy as $200 Million Opioid Payment Comes Due." The WSJ article went on to report that "A lender group advised by law firm Gibson Dunn & Crutcher has been in discussions with the company about how it can deal with the payment and possibly restructure its obligations, people familiar with the matter said." The article cautioned that "Mallinckrodt hasn't decided on any path and could try to

negotiate the opioid payment to avoid filing for bankruptcy," and was careful to note that a "spokesman for Mallinckrodt declined to comment."

96.    On this news, Mallinckrodt's ordinary share price fell $0.98 per share, or 40%, to close at $1.47 per share on June 5, 2023, the next trading day.

97.    On June 15, 2023, Defendants issued an SEC Form 8-K (the "June 15 8-K") in which they disclosed—for the first time—that they were "actively evaluating the Company's financial situation and considering options," intended to default on Mallinckrodt's credit obligations and were considering a "near term" bankruptcy.

98.    On June 23, 2023, Mallinckrodt filed another SEC Form 8-K (the "June 23 8-K") in which the Company disclosed that "[o]n June 14, 2023"—the day prior to the June 15 8-K—"the Board approved a variety of actions and programs focused on executive retention and incentive matters" in anticipation of a potential bankruptcy.

99.    The "actions and programs" approved by the Board and disclosed in the June 23 8-K were a windfall for Defendants that rewarded them for misrepresenting the Company's ability to fulfill the First Bankruptcy Plan and continue operating as a going concern. Rather than suffer any financial consequences in the bankruptcy, Defendants would emerge in markedly better financial condition than before.

100.   First, the Board approved a Key Employee Retention Plan ("KERP") for certain of its key officers, including for Olafsson and Reasons. Under KERP, the Olafsson and reasons were entitled to receive bonuses equal to 150% of their base salary simply for remaining with the company through the earlier of the confirmation of any plan in the Second Bankruptcy or June 14, 2024.

101.   The Board also approved a Key Employee Incentive Plan ("KEIP") for certain of its key officers, including Olafsson and Reasons, to replace the company's existing short-term and long-term cash incentive plans. Under KEIP, Olafsson and Reasons were entitled to receive up to 100% of their previous short-term incentive target bonus and 60% of their previous long-term incentive target bonus, up to a maximum amount of 150% of the total bonus targets. Defendants had waited to put the Company into the Second Bankruptcy until they could arrange to protect their share awards. With KERP, KEIP, and the MIP (described further below), their plan had succeeded spectacularly as their additional compensation and equity awards more than compensated them for the share grants that could be extinguished in the Second Bankruptcy.

102. On August 23, 2023, before the market opened, Mallinckrodt announced the signing of a Restructuring Support Agreement ("RSA") and an agreement to file a "prepackaged" bankruptcy. The RSA contemplated transactions (a) reducing Mallinckrodt's secured debt from approximately $3.6 billion to

approximately $1.75 billion by exchanging the remaining funded debt for the Company's reorganized equity and (b) reducing Mallinckrodt's remaining payments in the Opioid Settlement from $1.275 billion to $250 million.

103.  On August 28, 2023, Mallinckrodt initiated its second bankruptcy in under three years (the "Second Bankruptcy")[9] by filing a prepackaged Chapter 11 petition (the "Second Bankruptcy Plan"), which, among other things:

a.  reduced Mallinckrodt's debt by $1.85 billion, from approximately $3.6 billion USD to approximately $1.75 billion;

b.  amended Mallinckrodt's Opioid Settlement, reducing the Company's obligations from $1.275 billion to $250 million; and

c.  cancelled the Company's existing share capital and issued new shares to its lenders.

104.  In addition to wiping out the shareholders who had invested in Mallinckrodt in reliance on Defendants' assurances about the Company, the Second Bankruptcy Plan lopped $1 billion off the payments to the Opioid Trusts, and thus stiffing victims of the Opioid Crisis, the Second Bankruptcy Plan both nearly made certain creditors whole and effectively gave those creditors control of Mallinckrodt. Specifically, the Second Bankruptcy Plan allowed Mallinckrodt's senior creditors to recover between 81 cents and 95 cents on the dollar on their investments and awarded them over 90% of the reorganized Company's equity.

---

[9] In all, Mallinckrodt and 60 related entities filed for Chapter 11 bankruptcy protection. A complete list of all debtors is attached to this complaint as Exhibit A.

105.   The Second Bankruptcy Plan also helped the Company wriggle out from under fines in connection with the SEC Action. When Mallinckrodt eventually emerged from the Second Bankruptcy, on November 30, 2023, the SEC announced the settlement of the SEC Action, in which the Commission found that the Company's failure to properly disclose the dispute with CMS and USAO FCA investigation violated the antifraud provisions of the Securities Act and Securities Exchange Act.[10] The SEC had determined that a penalty of at least $40 million was appropriate, but effectively waived that fine because of the Second Bankruptcy.

106.   The Second Bankruptcy Plan also included a Management Incentive Plan ("MIP"). The MIP rewarded Defendants (and others) with up to 10% of the equity in the reorganized company, which, according to filings in the Second Bankruptcy, is estimated to be worth at least $100 million.

107.   The MIP was not a modification or replacement of an existing incentive plan. Rather, it was a new award of equity to Defendants *in addition to KERP and KEIP* that replaced the millions of dollars in stock that Defendants stood to lose in the Second Bankruptcy. In short, Defendants had realized a massive windfall by

---

[10] Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8a of the Securities Act of 1933 and Section 21c of The Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order, *In the Matter of Mallinckrodt plc*, No. 3-21806 (Nov. 30, 2023).

keeping secret Mallinckrodt's inability to fulfill the First Bankruptcy Plan or continue operating as a going concern.

108.    The bankruptcy court approved the Second Bankruptcy Plan on October 4, 2023. On November 14, 2023, the Company announced that the Second Bankruptcy Plan had become "effective," Mallinckrodt had completed its financial restructuring, and the investors who had relied on Defendants' assurances about the Company during the Class Period were eviscerated.

109.    As set forth below, however, this was not a bolt from the blue. Defendants had known from the moment that the Company emerged from the First Bankruptcy, or shortly thereafter, that Mallinckrodt had no hope of fulfilling the First Bankruptcy Plan and would not be able to continue to operate as a going concern.

## G. Defendants Knew It Was Impossible for Mallinckrodt To Fulfill the Second Bankruptcy Plan Or Continue Operating as a Going Concern

110.    Mallinckrodt's filings during the Second Bankruptcy attributed the Company's abrupt collapse to "significant unanticipated business developments, adverse economic conditions, and a market environment that the Company anticipates may prevent it from timely refinancing $817 million of upcoming debt maturities in 2025."

111.    Specifically, these filings linked Mallinckrodt's failure to "a setback to the launch of an important new Acthar-related device, stronger competition for Acthar, a slower-than-expected rebound in Therakos sales, and a rapid rise in interest

rates on" Mallinckrodt's "variable rate debt." Remarkably, the filings acknowledged that "the Company continues to perform in line with its 2023 guidance," but nevertheless insisted that "the escalation and persistence of high interest rates have absorbed increasingly more cash flow" that made debt payments impossible to fulfill.

112.  These assertions were also put to the High Court of Ireland when the Company sought its approval of the Second Bankruptcy Plan. For example, an independent expert report filed with the High Court stated that the Company had filed for the Second Bankruptcy after "a deterioration in the financial position of the Company during the course of the first half of 2023."

113.  Contrary to these statements, the events that purportedly caused the Company to become insolvent—"a setback to the launch of an important new Acthar-related device, stronger competition for Acthar, a slower-than-expected rebound in Therakos sales, and a rapid rise in interest rates on" Mallinckrodt's "variable rate debt"—*were anticipated* and the Company's financial position during the first half of 2023 *had improved, not declined*. Indeed, Defendants' filings and public reports during the time between when Mallinckrodt emerged from the First Bankruptcy and announced the Second Bankruptcy plainly showed that the Company had been performing exactly as Defendants had forecast from the moment Mallinckrodt emerged from the First Bankruptcy. The Company's descent into the

42

Second Bankruptcy was not the result of unforeseen market circumstances; rather, Mallinckrodt had no hope of ever fulfilling the First Bankruptcy Plan, and Defendants either knew or recklessly disregarded it.

114. For example, a Bloomberg Law article published two days after Mallinckrodt filed the Second Bankruptcy stated that, contrary to Defendants' claim that they had been caught off guard by Acthar's poor sales, "Acthar Gel sales had been struggling for years" prior to the Second Bankruptcy.[11]

115. Nor was stronger competition for Acthar unforeseen because, among other things, in January 2017 Mallinckrodt had settled claims by the United States Federal Trade Commission arising out of alleged anti-competitive practices in connection with Acthar. The drug's sales thus had been affected by competition for several years.[12]

116. In addition, during the Q2 2022 Call—which was held in **_August 2022_**, only weeks after Mallinckrodt had emerged from bankruptcy—Mallinckrodt's Global Corporate Controller & Chief Investor Relations Officer Daniel Speciale

---

[11] Evan Ochsner, *Mallinckrodt's Second Bankruptcy 'Flagrant' Case of Bad Plan*, Bloomberg Law, Aug. 30, 2023, https://news.bloomberglaw.com/bankruptcy-law/mallinckrodts-second-bankruptcy-flagrant-case-of-bad-plan.

[12] Federal Trade Commission, *Mallinckrodt Will Pay $100 Million to Settle FTC, State Charges It Illegally Maintained its Monopoly of Specialty Drug Used to Treat Infants*, Jan. 18, 2017, https://www.ftc.gov/news-events/news/press-releases/2017/01/mallinckrodt-will-pay-100-million-settle-ftc-state-charges-it-illegally-maintained-its-monopoly.

stated that, "I think one of the comments that we  made today ***was really just try to set an expectation for Acthar for the remainder of 2022 or 2023, maybe in totality*** and—so we referenced specifically, an approximately $500 million mark for that product this year." Far from undershooting this benchmark, the Company easily met this forecast, and, in February 2023, reported in the 2022 10-K net sales of Acthar of $516 million.

117.   Further, Defendants knew long before the end of 2022 that the new "injection device" for Acthar would not be available in 2023. During the Q3 2022 Call, in early November 2022, Olafsson apprised investors that "[w]e are encouraged to see early signs of demand stabilization for Acthar Gel and performance in the quarter was consistent with our expectations," but, as to the Acthar injection device, "[a]s we said last quarter, device development has been completed and we are ready to proceed with submission. However, a regulatory matter involving one of our partners remains ongoing, as a result, we do not anticipate the launch in 2023." Neither at the time of this announcement, nor at any point thereafter until the Company filed the Second Bankruptcy, did Defendants ever suggest that Mallinckrodt's ability to operate as a going concern hinged on approval of any injection device for Acthar.

118.   Similarly, Defendants knew full well that interest rates were going to rise when Mallinckrodt was emerging from the First Bankruptcy. For example, on

May 11, 2022, over month before the First Bankruptcy Plan became effective, the Associated Press reported that "The unexpected persistence of high inflation has caused the Fed to embark *on what may become its fastest series of interest rate increases in 33 years*." The article continued, "the Fed raised its benchmark short-term rate by a half-point, its steepest increase in two decades . . . [and] *signaled that more such sharp rate hikes are coming*."[13]

119.    A month later, the New York Times reported that "[t]he Fed raised rates by half a percentage point in May and officials *had suggested for weeks that a similar increase would be warranted at their meetings in June and July* if data evolved as expected," and revealed that the Fed was considering *the largest interest rate increase since 1994*.[14]

120.    The following month, on July 29, Al Jazeera reported that "[t]he Federal Reserve raised interest rates by 75 basis points on Wednesday. The US central bank has increased its efforts to combat the greatest inflation in more than 40 years and stated that more 'unusually large increase[s] could be appropriate' at its

---

[13] Associated Press, *U.S. inflation hit 8.3% last month but slows from 40-year high*, POLITICO, May 11, 2022, https://www.politico.com/news/2022/05/11/inflation-april-price-increase-peak-00031696.

[14] Jeanna Smialek, The Fed May Discuss the Biggest Interest Rate Increase Since 1994, NY TIMES, June 13, 2022, https://www.nytimes.com/2022/06/13/business/fed-interest-rate-increase.html?searchResultPosition=28.

September meeting." The article further observed that "[s]ince March, the Fed has increased rates by 225 basis points."[15]

121.   Not only were Defendants completely aware of what they would later characterize as unexpected events, but Mallinckrodt's performance was entirely consistent with Defendants' expectations during the Class Period.

122.   For example, during the Q2 2022 Call—the Company's first earnings call since emerging from the First Bankruptcy and after prominent news coverage of interest rate hikes—Reasons stated that the Company's guidance to investors predicted that "for the full year 2022, *we expect to achieve total net sales of between $1.875 billion and $1.925 billion* . . . . *And adjusted EBITDA of between $630 million and $660 million*."

123.   Over the next several months the Company squarely fulfilled this guidance. The 2022 Release, which reported Mallinckrodt's financial results for the full year 2022, disclosed *net sales of $1.914 billion and adjusted EBITDA of $674.9 million*. The Company had hit the benchmarks it had set for itself upon emerging from the First Bankruptcy with full knowledge of, among other things, increased

---

[15] Radmilla Suleymanova, Top economic takeaways as US wrangles with recession fears, AL JAZEERA, July 29, 2022.
https://www.aljazeera.com/economy/2022/7/29/top-economic-takeaways-as-us-wrangles-with-recession-
fears#:~:text=Back%2Dto%2Dback%20GDP%20slowdown,highlights%20from%20a%20busy%20week.

competition for Acthar, delays in Acthar's injectable device, and increasing interest rates.

124. The 2022 Release also included guidance for Mallinckrodt's performance in 2023. This guidance forecast total net sales in 2023 of between $1.700 billion and $1.820 billion, with adjusted EBITDA of $510 million to $560 million. Prior to the Second Bankruptcy, Defendants reaffirmed this guidance without any changes, multiple times. They also repeatedly reassured investors that the Company's financial condition and liquidity had improved, in that the Company had $480 million of cash on its balance sheet, up $75 million from the end of 2022, had around $200 million available to be drawn under a bank line of credit, and was not in default on any debts. Accordingly, as far as Plaintiffs and shareholders knew, the Company was in a position to fulfill its obligations and had enough funds to keep operating for at least another 12 months.

125. Defendants never apprised investors, however, that even if it performed as predicted, the Company could not fulfill the First Bankruptcy Plan or continue operating as a going concern.

126. As set forth above, on December 9, 2021, during the sixteen days of hearings leading up to the First Bankruptcy Court's confirmation of the First Bankruptcy Plan, Mallinckrodt's CRO, Randall Eisenberg, testified unequivocally that the First Bankruptcy Plan would maximize value for stakeholders receiving

distributions, was not likely to be followed by a liquidation or a need for further reorganization, and post-restructuring,  and that Mallinckrodt would not be left with an unreasonably small amount of capital to operate.

127.   Eisenberg's testimony was based on the First Plan Forecasts— projections for Mallinckrodt that were issued in September 2021.[16] The First Plan Forecasts projected net sales for the Company of $2.2 billion to $2.4 billion for the years 2022 to 2025 and adjusted earnings before interest, depreciation, taxes, and amortization ("EBIDTA") of $791 million to $820 million over that same period.

128.   Although Eisenberg had convinced the Bankruptcy Court that First Plan Forecasts demonstrated that the Company could fulfill the First Bankruptcy Plan and remain solvent, Defendants knew that the Company could not meet these projections.

129.   For example, Reasons's guidance on the Q2 2022 Call of total net sales in 2022 of between $1.875 billion and $1.925 billion and adjusted EBITDA of between $630 million and $660 million were ***hundreds of millions of dollars below the First Plan Forecasts***. Defendants never advised investors on the Q2 2022 Call, or at any point thereafter, that if the Company performed as expected it would be

---

[16] *See* Mallinckrodt plc, Current Report (Form 8-K) (October 26, 2021), Exh. 99.1.

effectively insolvent and could not fulfill the First Bankruptcy Plan or continue operating as a going concern.

130.   Instead, during the Class Period, Defendants instructed investors to ignore the projections it had used to convince the First Bankruptcy Court to approve the First Bankruptcy Plan. The Company's annual report on Form 10-K for 2022 (the "2022 10-K") included a risk factor that expressly advised investors that the First Plan Forecasts "were prepared solely for the purposes stated therein and have not been, and will not be, updated on an ongoing basis *and should not be relied upon by investors*." Defendants thus expressly tried to prevent investors from recognizing that their own guidance indicated that the Company could not fulfill the First Bankruptcy Plan or continue operating as a going concern.

131.   In other words, while Defendants assured investors that the Company was exceeding the expectations set by Defendants when the Company emerged from bankruptcy, and thus was on solid financial footing, the truth was that Mallinckrodt could not fulfill its bankruptcy plan or continue operating as a going concern, and Plaintiffs and other shareholders in Mallinckrodt were certain to have their investments eviscerated.

132.   Defendants also knew, but either did not disclose or recklessly disregarded the true facts about the Company's condition shortly after the Company emerged from the First Bankruptcy.

133. For example, according to filings in the Second Bankruptcy, Defendants had been "working closely" with investment banker Guggenheim Securities *since October 1, 2022*, on, among other things, an evaluation of their strategic alternatives, *i.e.*, the Company's financial condition and ability to operate as a going concern in its current condition when compared with its outstanding debt and settlement obligations.

134. These filings further revealed that "Guggenheim Securities [had] worked closely with the Debtors' management [*i.e.*, Olafsson and Reasons] and other professionals retained by the Debtors with respect to these strategic alternatives and [had] become acquainted with the Debtors' capital structure and business." The filings also stated that Guggenheim Securities had been retained previously in connection with Mallinckrodt's First Bankruptcy. The work done by Defendants, together with Guggenheim, led to the Second Bankruptcy and thus made Defendants aware of the true state of the Company's financial affairs since at least October 2022.

135. Further, according to the Goodson Declaration, by spring 2023 the Company was considering "strategic alternatives." Specifically, Goodson stated that, because of concerns about Mallinckrodt's financial condition, Defendants "had caused the Company to begin considering alternatives for consensually extending its payment schedules and addressing its long-term obligations. By Spring 2023, the

Company had already engaged with certain lender constituents around potential refinancing options." In other words, Defendants knew at least prior to May 9, 2023, that the Company could not fulfill the terms of the First Bankruptcy Plan and was headed back into bankruptcy.

136.    In short, although none of Defendants ever expected the Company to fulfill the First Bankruptcy Plan and remain solvent, no Defendant ever disclosed to investors that the Company was on a path to certain ruin that results in the Second Bankruptcy and a complete wipeout of equity investments.

137.    Indeed, news reports saw right through Defendants' claims of unexpected hardships, and instead viewed the Second Bankruptcy as an exercise in sophisticated fiscal engineering. On December 14, 2023, the Wall Street Journal reported that "Pharmaceutical manufacturers Mallinckrodt and Endo International both completed transactions that *gave priority to the interests of their financial creditors over those of opioid victims, and rewarded the companies' top executives with bonuses or accelerated compensation before filing for chapter 11*."

138.    As a result of Defendants' wrongful acts and omissions alleged above, which resulted in the precipitous decline in the market value of the Company's securities, as alleged below, Plaintiffs and other Class members have suffered significant losses and damages.

## <u>MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD</u>

139.   Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. These statements included, among other things, assertions that (i) Defendants were confident that Mallinckrodt had the ability to create value for shareholders after it emerged from the First Bankruptcy; (ii) the Company's operating plan could enable it to fulfill the First Bankruptcy Plan and continue operating as a going concern; (iii) the Company had sufficient liquidity to remain solvent; (iv) the Company's financial performance, which met specific benchmarks and showed improvement, was sufficient to keep operating as a going concern; and (v) advised that bankruptcy concerns were in the past.

140.   These statements, as set forth in detail below, were false and misleading because Defendants had knowingly or recklessly overstated Mallinckrodt's financial strength, including purported enhancements to its liquidity and balance sheet, following its emergence from Chapter 11 bankruptcy protection and Mallinckrodt's ability to timely make one or more payments pursuant to the Opioid Settlement; and as a result of the foregoing, the Company was at an increased risk of having to again file for Chapter 11 bankruptcy protection.

A. **June 2022**

141.  On June 16, 2022, after markets had closed, Mallinckrodt issued the June 2022 Release, entitled "Mallinckrodt Emerges from Chapter 11 with Strengthened Balance Sheet and Enhanced Financial Flexibility." In that release, Olafsson assured investors that "Mallinckrodt is emerging from its recent restructuring process with an attractive pipeline, ***enhanced financial flexibility and significant opportunities to drive stakeholder value***."

142.  In addition, the June 2022 Release quoted Bisaro, who assured investors that "Today marks a new beginning for Mallinckrodt as ***we emerge well-positioned for long-term success, with a substantially stronger capital structure*** and major litigation matters permanently resolved."

143.  By stating that the Company had "enhanced financial flexibility" and "significant opportunities to drive stakeholder value," was "well positioned for long-term success," and had a "substantially stronger capital structure," in the statements in paragraphs 141-42 above, Defendants were communicating to investors that Mallinckrodt had the financial resources to fulfill the First Bankruptcy Plan, make its payments to the Opioid Trusts, continue operating as a going concern, and was not in danger of filing for bankruptcy. These statements were false and misleading, however, because Defendants had overstated Mallinckrodt's financial strength, including purported enhancements to its liquidity and balance sheet, following its

53

emergence from Chapter 11 bankruptcy protection and Mallinckrodt's ability to timely make one or more payments pursuant to the Opioid Settlement; and as a result of the foregoing, the Company was at an increased risk of having to again file for Chapter 11 bankruptcy protection.

## B. August 2022

144. On August 11, 2022, Defendants issued the Q2 Release, which quoted Olafsson, who stated:

> This quarter represented an important moment for Mallinckrodt as we began the work of turning the business around and moving forward with renewed focus on our patients, products, pipeline and people following the completion of our financial reorganization . . . . While the Company has faced many challenges, *we have a strong foundation and significant potential*, which is why I am excited to lead Mallinckrodt alongside the new Board of Directors. Together, we are focused on Mallinckrodt's future and re-energizing the organization around our shared passion for making an impact on patients' lives by addressing unmet medical needs. *Mallinckrodt today benefits from significant liquidity, meaningful cash flows from operations, a solid U.S. commercial platform and competitive positioning* in Critical Care and Immunology. While we have work to do, *the foundational pieces are in place to stabilize the core brands and return the business to sustainable growth and profitability over time*.
>
> * * *
>
> As we work to chart Mallinckrodt's path forward, our near-term priorities include strengthening the Company's balance sheet and continuing to generate strong cash flow; stabilizing our portfolio and maximizing opportunities for our in-market products; and investing strategically in our pipeline with a focus on potential cash contribution and return on investment. *We're confident that by executing on our plans, we can create long-term value for our stakeholders* while improving outcomes for patients with severe and critical conditions.

145.    In addition, the Q2 2022 Release quoted Reasons, who stated:

Having eliminated more than $1.3 billion in debt principal and closed a new $200 million accounts receivable financing facility with the overhang and expense of the opioid litigation now behind us, *we have a clear path forward to continue operating the business in a responsible manner* and delivering benefits to patients. Looking ahead, we are focused on further reducing debt as we continue enhancing operating efficiencies and generating additional cash through the successful execution of our strategic priorities.

146.    The same day, Defendants held the Q2 2022 Call. On the call, Olafsson touted the strength of Mallinckrodt as it emerged from bankruptcy, stating, "A lot of work has been done already to establish a strong foundation in the business, which is underpinned by *significant liquidity, meaningful cash flows from operation, a solid U.S. commercial platform* and competitive positioning in critical care and immunology." Olafsson also assured investors that, "I wouldn't be here speaking with you today [if I] *didn't have every confidence in Mallinckrodt's ability to create value for shareholders* and make a positive impact on patients' lives every day."

147.    Later in the Call, Olafsson said:

I want to restate that Mallinckrodt today has a strong foundation underpinned by significant liquidity, meaningful cash flows from operation, a solid U.S. commercial platform and competitive positioning in critical care and immunology. And while we still have challenges ahead, *I believe we are well equipped to meet them. We have a clear path forward to stabilize the business by executing our near-term priorities and the top priority for me will be to reenergize our teams and helping to reinduce our stakeholders to Mallinckrodt*.

These efforts truly go hand in hand. Finally, the more I've learned about the company, the further my conviction has become that *Mallinckrodt*

*has a strong future* rooted in an unwavering focus on improving outcome for patients.

148.    In the statements in paragraphs 144-47 above, Defendants were communicating to investors that Mallinckrodt had the financial resources to fulfill the First Bankruptcy Plan, make its payments to the Opioid Trusts, continue operating as a going concern, and was not in danger of filing for bankruptcy. These statements were false and misleading, however, because Defendants had overstated Mallinckrodt's financial strength, including purported enhancements to its liquidity and balance sheet, following its emergence from Chapter 11 bankruptcy protection and Mallinckrodt's ability to timely make one or more payments pursuant to the Opioid Settlement; and as a result of the foregoing, the Company was at an increased risk of having to again file for Chapter 11 bankruptcy protection.

149.    Also, on August 11, 2022, Mallinckrodt filed a quarterly report on Form 10-Q with the SEC, which was signed by Reasons, reporting the Company's financial and operational results for its second fiscal quarter ended July 1, 2022 (the "Q2 2022 10-Q").  The Q2 2022 10-Q represented, *inter alia*, that Mallinckrodt "*will* make [a] payment[] of $200.0 million . . . inclusive of interest, related to our opioid . . . related settlement[] upon the one year anniversary of the [June 16, 2022] Effective Date"—*i.e.*, by June 16, 2023.

150.    The Q2 2022 10-Q also indicated that Mallinckrodt could and would make all nine payments over eight years to the Opioid Trusts in a timely manner,

while simultaneously downplaying the risk of the Company's default under applicable agreements, stating, in relevant part:

> Opioid claims were channeled to certain trusts, which **will** receive $1,725.0 million in deferred payments from the Company and certain of its subsidiaries (the "Opioid-Related Litigation Settlement") consisting of (i) a $450.0 million payment upon the Effective Date (of which $2.6 million was prefunded); (ii) a $200.0 million payment upon each of the first and second anniversaries of the Effective Date; (iii) a $150.0 million payment upon each of the third through seventh anniversaries of the Effective Date; and (iv) a $125.0 million payment upon the eighth anniversary of Effective Date (collectively, the "Opioid Deferred Payments") with the Company retaining an eighteen-month option to prepay outstanding Opioid Deferred Payments (other than the initial Effective Date payment) at a discount (and to prepay the Opioid Deferred Payments at their undiscounted value even after the expiration of such eighteen-month period). The Opioid Deferred Payments are unsecured and are guaranteed by Mallinckrodt and its subsidiaries that are borrowers, issuers or guarantors . . . . The Opioid Deferred Cash Payments Agreement contains affirmative and negative covenants (including an obligation to offer to pay the Opioid Deferred Payments without discount upon the occurrence of certain change of control triggering events) and events of default (subject in certain cases to customary grace and cure periods). The occurrence of an event of default under the Opioid Deferred Cash Payments Agreement **could** result in the required repayment of all outstanding Opioid Deferred Payments and **could** cause a cross-default that **could** result in the acceleration of certain indebtedness of Mallinckrodt and its subsidiaries.

151.  The statements in paragraphs 150-51 above were false and misleading because Defendants knew that Mallinckrodt lacked the financial resources to make its payments to trusts pursuant to the Opioid Settlement.

152.  Appended as an exhibit to the Q2 2022 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Olafsson and

Reasons certified that the Q2 2022 10-Q "fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the [Exchange Act], as amended, and that the information contained in the [Q2 2022 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the Q2 2022 10-Q falsely communicated to or gave investors the misimpression that Mallinckrodt could fulfill the First Bankruptcy Plan and continue as a going concern, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Mallinckrodt.

### C. **November 2022**

153.    On November 8, 2022, Mallinckrodt issued a press release announcing its third quarter 2022 financial results (the "Q3 2022 Release").  The Q3 2022 Release quoted Defendant Olafsson, who stated, in relevant part:

> We made important progress executing on our strategic initiatives, including . . . ***improving our balance sheet and strengthening the organization*** with key leadership appointments at the executive and board levels, adding deep commercial and human resources expertise. More recently, we received approval and commenced trading on NYSE American, ***providing enhanced liquidity*** and access for our shareholders.
>
> * * *
>
> Looking ahead, I am confident we are well-positioned to continue advancing our strategic initiatives and create long-term value for shareholders while improving outcomes for patients with severe and critical conditions.

154.   The same day, Mallinckrodt hosted the Q3 2022 Call. On the call, Olafsson had nothing but positive things to say about Mallinckrodt, effusing, "My first full quarter as a CEO reinforced my confidence in Mallinckrodt and the ability of our talented employees to build a great business focused on improving the lives of patients . . . 2023 will be an important year for Mallinckrodt and *I believe we have the right plan in place to move forward successfully*."

155.   Also, on the Q3 2022 Call, Olafsson assured investors that:

I want to reiterate my belief that Mallinckrodt today has a strong foundation underpinned by significant liquidity, meaningful cash flows from operations, a solid U.S. commercial platform, and competitive positioning in critical care and immunology.

* * *

We have a high visibility into our heads been some challenges ahead. And we remain committed to delivering on our goals and turning the business around. We're exactly where we said we would be last quarter and expect to deliver on our guidance for the full year. By executing on near term priorities, continuing to re-energize our organization, and delivering for stakeholders *Mallinckrodt has a strong future ahead* developing therapies designed to improve outcomes for patients.

156.   During the call, Olafsson also expressly emphasized to investors that Acthar was performing consistent with expectations, stating, "[w]e are encouraged *to see early signs of demand stabilization for Acthar Gel and performance in the quarter was consistent with our expectations*."

157.   Olafsson then emphasized the Company's positive performance and financial position to investors again, saying:

I want to reiterate my belief that Mallinckrodt today **has a strong foundation underpinned by significant liquidity, meaningful cash flows from operations**, a solid U.S. commercial platform, and competitive positioning in critical care and immunology . . . . **We're exactly where we said we would be last quarter and expect to deliver on our guidance for the full year. By executing on near term priorities, continuing to re-energize our organization, and delivering for stakeholders Mallinckrodt has a strong future ahead developing therapies designed to improve outcomes for patients**.

158. In the statements in paragraphs 153-57 above, Defendants were communicating to investors that Mallinckrodt had the financial resources to fulfill the First Bankruptcy Plan and continue operating as a going concern. These statements were false and misleading, however, because Defendants had overstated Mallinckrodt's financial strength, including purported enhancements to its liquidity and balance sheet, following its emergence from Chapter 11 bankruptcy protection and Mallinckrodt's ability to timely make one or more payments pursuant to the Opioid Settlement; and as a result of the foregoing, the Company was at an increased risk of having to again file for Chapter 11 bankruptcy protection. In addition, by characterizing the plan Mallinckrodt was using to fulfill the First Bankruptcy Plan as "**the right plan in place to move forward successfully**," Olafsson assumed a duty to disclose all material facts about that plan, including that Defendants' projections for the Company's performance were not sufficient to enable the Company to fulfill the First Bankruptcy Plan, fulfill its obligations in connection with the Opioid Settlement, or avoid a subsequent bankruptcy filing.

159.   Also on November 8, 2022, Mallinckrodt filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for its third fiscal quarter ended September 30, 2022 (the "Q3 2022 10-Q").  The Q3 2022 10-Q contained substantively the same statements as referenced in paragraphs 149-50, *supra*, representing that Mallinckrodt "will" make its $200 million payment to the Trust for the Opioid Settlement by June 16, 2023; and indicating that Mallinckrodt could and would make all nine payments over eight years to the Opioid Trusts in a timely manner, while simultaneously downplaying the risk of the Company's default under applicable agreements.

160.   The statements in paragraph 159 above were false and misleading because Defendants knew that Mallinckrodt lacked the financial resources to make its payments to trusts pursuant to the Opioid Settlement.

161.   Appended as an exhibit to the Q3 2022 10-Q were signed SOX certifications wherein Olafsson and Reasons certified that the Q3 2022 10-Q "fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the [Exchange Act], as amended, and that the information contained in the [Q3 2022 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the Q3 2022 10-Q falsely communicated to or gave investors the misimpression that Mallinckrodt could fulfill the First Bankruptcy Plan and continue as a going concern,

and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Mallinckrodt.

### D. February 2023

162.   On February 28, 2023, Mallinckrodt issued the FY22 Release, which quoted Defendant Olafsson, who stated:

> We are pleased with our performance this quarter as we continued the steady execution of our strategic priorities . . . . We finished 2022 by exceeding our EBITDA guidance and achieving the high end of our net sales guidance for the year. ***We also increased cash on hand, reflecting our ongoing efforts to strengthen the balance sheet and optimize our cost structure.***
>
> * * *
>
> Looking ahead, 2023 is an important year for Mallinckrodt. We have some meaningful opportunities in the business . . . . In all, we believe ***Mallinckrodt is well-positioned to stabilize the business in the near term and achieve sustainable growth in the long term***. We have made solid progress on our key initiatives and remain committed to advancing our business strategy while improving outcomes for patients with severe and critical conditions.

163.   The same day, Mallinckrodt held the FY 2022 Call. On that call, Olafsson also touted to investors that "we have been focused on executing our three near-term strategic priorities, strengthening the balance sheet, stabilizing our portfolio, and making the right investments in our pipeline. ***We are beginning to see evidence of solid execution of these initiatives in the full year results***."

164.   On the FY 2022 Call, Olafsson stated, *inter alia*, that "[w]e . . . saw a slight increase in cash in hand during the fourth quarter and ***believe our liquidity will***

*allow us to continue making important investments in the business*." Olafsson further stated that "2023 is a pivotal year for the company, and *we stand ready to navigate the opportunities and the challenges we have ahead of us*. I am pleased with our efforts today and *I have a great confidence in Mallinckrodt's long-term ability to drive value for stakeholders*."

165.  Olafsson also advised investors that, "[w]e have some real opportunities ahead," and continued, "*we are prepared to face challenges this year* [and] on, including the loss of royalty due to generate competition in the U.S. for Amitiza *and Acthar competition*. While there are some clear challenges to the business, *I believe we are taking the right steps to mitigate these operational impacts, and we are seeing encouraging signs across both business segments*."

166.  Also on the FY 2022 Call, a representative of Brean Asset Management observed, "I believe there was an 18-month extension opportunity to prepay" the amounts owed by Mallinckrodt in connection with the Opioid Settlement. The representative then asked, "I wanted to know how you guys are thinking about that in concurrence with opportunities to buyback debt." Far from suggesting that the Company could not afford to make the upcoming opioid payment at all, Defendant Reasons suggested that the Company could prepay that liability, stating:

> Look, when we negotiated that, we had -- we put in an 18-month period that we could prepay that at a significant discount. Clearly, the capital markets shifted since then. *So, we still have that opportunity, but we're looking at the capital structure holistically monitoring the capital*

*markets. So, from a capital allocation, if that's the best return on our use of liquidity, we'll do that. But certainly, delevering in other areas of our cap structure have become very attractive as well right now.* So -- but we have 18 months from emergence to capture that discount.

167.   In the statements in paragraphs 162-66 above, Defendants were communicating to investors that Mallinckrodt had the financial resources to fulfill the First Bankruptcy Plan and continue operating as a going concern. These statements were false and misleading, however, because Defendants had overstated Mallinckrodt's financial strength, including purported enhancements to its liquidity and balance sheet, following its emergence from Chapter 11 bankruptcy protection and Mallinckrodt's ability to timely make one or more payments pursuant to the Opioid Settlement; and as a result of the foregoing, the Company was at an increased risk of having to again file for Chapter 11 bankruptcy protection.

## E. March 2023

168.   On March 3, 2023, Mallinckrodt filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for its fourth fiscal quarter and year ended December 30, 2022 (the "2022 10-K"). The 2022 10-K contained substantively the same statements as referenced in ¶¶149-50, *supra*, indicating that Mallinckrodt could and would make all nine payments over eight years to the Opioid Trusts in a timely manner, while simultaneously downplaying the risk of the Company's default under applicable agreements.

169.    The statements in paragraph 169 above were false and misleading because Defendants knew that Mallinckrodt lacked the financial resources to make its payments to trusts pursuant to the Opioid Settlement.

170.    The 2022 10-K also contained representations designed to reinforce for investors that concerns about Mallinckrodt's ability to operate as a going concern were a thing of the past, and not any concern going forward.

171.    For example, in a disclosure regarding income taxes, the 2022 10-K stated that, "Fiscal 2020 (Predecessor) includes a tax expense of $204.9 million for an increase to the valuation allowance on certain net deferred tax assets that were no longer more likely than not realizable due to the Company's ***former substantial doubt about its ability to continue as a going concern***. Additional valuation allowance impacts are netted within other line items, as referenced in the associated footnotes."

172.    Defendants reiterated this later in the 2022 10-K, informing investors:

During the period from January 1, 2022 through June 16, 2022 (Predecessor), the Company recognized a tax benefit of $600.8 million related to valuation allowances, consisting of $512.1 million of tax benefit for the reduction in the valuation allowance on the Company's deferred tax assets ***due to the alleviation of the previous substantial doubt about the Company's ability to continue as a going concern***.

173.    Defendants made this representation for a third time later in the 2022 10-K as well:

As of December 30, 2022 (Successor), due to the ***alleviation of the previous substantial doubt about the Company's ability to continue as a going concern***, the associated valuation allowances were released through fresh-start accounting at emergence.

174.   In the statements in paragraphs 171-73 above, Defendants were communicating to investors that concerns about Mallinckrodt's ability to operate as a going concern were a thing of the past, especially given that the 2022 10-K contained no other warning that the Company was at immediate risk of defaulting on its debt or filing for bankruptcy for a second time. These statements were false and misleading, however, because Defendants had overstated Mallinckrodt's financial strength, including purported enhancements to its liquidity and balance sheet, following its emergence from Chapter 11 bankruptcy protection and Mallinckrodt's ability to timely make one or more payments pursuant to the Opioid Settlement; and as a result of the foregoing, the Company was at an increased risk of having to again file for Chapter 11 bankruptcy protection.

175.   Indeed the 2022 10-K included a specific disclosure concerning "Risks Related to Our Emergence from Bankruptcy." The risks Defendants identified were:

•We recently emerged from bankruptcy, which could adversely affect our business and relationships.

•Our actual financial results after emergence from bankruptcy may not be comparable to our projections filed with the Bankruptcy Court or otherwise made public in the course of the Chapter 11 Cases (as defined below).

•Our historical financial statements are not comparable to those produced after the application of fresh-start accounting.

•Upon our emergence from bankruptcy, our Board of Directors was changed and may implement changes in our business strategy that could affect the scope and results of our operations.

•We have contractual and court-ordered compliance obligations that if violated could result in exclusion from participation in federal healthcare programs and monetary, injunctive and/or other sanctions.

176.   None of the statements in paragraph 175 above apprised investors that Mallinckrodt was at immediate risk of defaulting on its debt or filing for bankruptcy for a second time. When the Company chose to opine on the risks it faced when exiting from bankruptcy, it assumed a duty to make those statements complete and accurate. Defendants violated this duty by overstating Mallinckrodt's financial strength, including purported enhancements to its liquidity and balance sheet, following its emergence from Chapter 11 bankruptcy protection and Mallinckrodt's ability to timely make one or more payments pursuant to the Opioid Settlement; and as a result of the foregoing, failing to disclose that the Company was at an increased risk of having to again file for Chapter 11 bankruptcy protection.

177. Appended as an exhibit to the 2022 10-K were signed SOX certifications, wherein Olafsson and Reasons certified that the 2022 10-K "fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the [Exchange Act], as amended, and that the information contained in the [2022 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because

the 2022 10-K falsely communicated to or gave investors the misimpression that Mallinckrodt could fulfill the First Bankruptcy Plan and continue as a going concern, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Mallinckrodt.

F.  **May 2023**

178.  On May 9, 2023, Mallinckrodt issued a press release announcing its first quarter 2023 financial results (the "Q1 2023 Release"). The Q1 2023 Release quoted Defendant Olafsson, who stated, in relevant part:

> Mallinckrodt had a solid start to the year. We made steady progress on key opportunities in our branded portfolio and delivered sales growth in the Specialty Generics segment . . . . Further, *we increased cash on hand, demonstrating our continued commitment to disciplined capital management*.
>
> * * *
>
> As we have stated, 2023 is a pivotal year for Mallinckrodt. We have a number of opportunities ahead, as well as challenges from competitive pressures, *while we work to stabilize the business in the near term and position Mallinckrodt for sustainable long-term growth*. Overall, we are pleased with the performance this quarter, *as evidenced by our reaffirmation of 2023 guidance* . . . . We will continue to be sharply focused on advancing our strategic priorities, all while keeping our mission to improve outcomes for patients with severe and critical conditions at the core of everything we do.

179.  The same day, Mallinckrodt hosted the Q1 2023 Call.  On the call, Defendant Olafsson stated, inter alia, that "[w]e again increased our cash on hand, demonstrating that disciplined cost management and strengthening the balance sheet

are top of mind in every decision we make" and that "[i]t is great to see further improvement on this front."

180.  Also, on the Q1 2023 Call, Olaffson did not suggest that Acthar's sales presented a problem for the Company's bottom line or ability to operate as a going concern. Instead, Olafsson said, "*[w]e remain confident in Acthar's long-term prospects*, and we'll also continue to drive the submission of the Acthar next-generation delivery device, pending resolution of third-parties regulatory matters we have previously mentioned." Olafsson further assured investors that "while performance was essentially flat in the quarter from last year, *we still anticipate the product will see sequential net sales growth throughout the year as it returns to a historical mid-single digit growth rates*."

181.  On that same call, Olafsson touted that "we are pleased to be able to reaffirm our full year net sales and adjusted EBITDA guidance despite the softer than expected Acthar performance. For Acthar, we now expect the sales to decline between 15% to 20% in 2023. *Having a well diversified business allows us to manage through these challenges and remain on track to deliver on our expectation and our strategic goals*." In addition, he said, "While we still have to work – *while we still have work to do, our progress to date reinforces my confidence in Mallinckrodt's ability to drive a long-term value while continuing to deliver for our patients*."

182.    Olafsson concluded the Q1 2023 Call on a high note, telling investors that "***Mallinckrodt began the year well and I'm confident that we will continue to make good progress throughout 2023. I can personally attest to the strides we have made across the company to put the business into a stronger position for the future***. While we need to stay intensely focused on our goals and priorities, it gives me a great pride to see what our teams have already achieved. I look forward to all that we will accomplish the remainder of the year for our patients and each other."

183.    Also, on the Q1 2023 Call, Defendant Reasons stated, *inter alia*:

> We ended the quarter with roughly $680 million of liquidity. We reported cash and cash equivalents of $480 million, which included the receipt of the CARES Act refund and maintained an undrawn accounts receivable credit facility of up to $200 million. Total principle debt outstanding at the end of the first quarter was $3.523 billion with net debt of $3.043 billion. ***We entered into an interest rate cap agreement during the quarter, which serves to reduce volatility on a portion of our floating interest rate exposure***.
>
> In all, ***we're pleased with the start of the year for the business overall and our ability to reaffirm our 2023 net sales and adjusted EBITDA guidance***. We remain highly focused on improving our balance sheet in the months ahead.

184.    Olafsson's positive outlook was reaffirmed in the Q1 2023 10-Q, which stated that Defendants "believe that ***our sources of liquidity are adequate to fund our operations for the next twelve months and foreseeable future***." Defendants simply could not have believed this, however, because according to the Goodson Declaration, at essentially the same time Defendants were making these statements,

"the Company was presently insolvent comparing its value as a going concern to the face amount of its debt and settlement obligations."

185.   In the statements in paragraphs 178-84 above, Defendants were communicating to investors that Mallinckrodt had the financial resources to fulfill the First Bankruptcy Plan and continue operating as a going concern. These statements were false and misleading, however, because Defendants had overstated Mallinckrodt's financial strength, including purported enhancements to its liquidity and balance sheet, following its emergence from Chapter 11 bankruptcy protection and Mallinckrodt's ability to timely make one or more payments pursuant to the Opioid Settlement; and as a result of the foregoing, the Company was at an increased risk of having to again file for Chapter 11 bankruptcy protection.

186.   Appended as an exhibit to the Q1 2023 10-Q were signed SOX certifications wherein Olafsson and Reasons certified that the Q1 2023 10-Q "fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the [Exchange Act], as amended, and that the information contained in the [Q1 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the Q1 2023 10-Q falsely communicated to or gave investors the misimpression that Mallinckrodt could fulfill the First Bankruptcy Plan and continue as a going concern,

and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Mallinckrodt.

## THE TRUTH EMERGES

187.   On June 2, 2023, during after-market hours, and less than a month since Mallinckrodt reaffirmed its full-year 2023 financial guidance, the WSJ published an article, titled "Mallinckrodt Explores Repeat Bankruptcy as $200 Million Opioid Payment Comes Due", which stated, in relevant part:

> Drugmaker Mallinckrodt is considering options including a repeat bankruptcy filing after emerging from chapter 11 last year as a $200 million opioid settlement payment comes due within weeks, people familiar with the matter said.
>
> The Dublin-based drugmaker is required to make the payment to an opioid-victims compensation trust by mid-June under a $1.7 billion settlement as part of its chapter 11 exit plan. A lender group advised by law firm Gibson Dunn & Crutcher has been in discussions with the company about how it can deal with the payment and possibly restructure its obligations, people familiar with the matter said.
>
> The company, which has faced financial headwinds since exiting chapter 11, is considering another bankruptcy filing and other possible options, the people said. Mallinckrodt hasn't decided on any path and could try to negotiate the opioid payment to avoid filing for bankruptcy, they said.
>
> A spokesman for Mallinckrodt declined to comment.

188.   On this news, Mallinckrodt's ordinary share price fell $0.98 per share, or 40%, to close at $1.47 per share on June 5, 2023, the next trading day.

189.   Then, on June 15, 2023, during pre-market hours, Mallinckrodt filed a current report on Form 8-K with the SEC, disclosing that the Company had

determined not to make interest payments on two bonds due that day and may need to file for bankruptcy.  Specifically, the filing stated, in relevant part:

> As previously disclosed, the Board of Directors of Mallinckrodt plc (the "Company") is actively evaluating the Company's financial situation and considering options, including transactions that have been proposed by holders of various series of the Company's indebtedness and other Company stakeholders, as well as the viewpoints of the various parties in interest. The Company continues to analyze its situation and engage with various stakeholders. There can be no assurance of the outcome of this process, ***including whether or not the Company may make a filing in the near term or later under the U.S. Bankruptcy Code or analogous foreign bankruptcy or insolvency laws***.

> As the Board continues to evaluate alternatives, on June 15, 2023, the Company determined not to make interest payments that were due that date on its (i) 11.500% First Lien Senior Secured Notes due 2028 (the "2028 First Lien Notes") and (ii) 10.000% Second Lien Senior Secured Notes due 2029 (the "2029 Second Lien Notes").

> \* \* \*

> The failure to make the interest payments due on June 15, 2023, under each series of notes will constitute an event of default for such series if such failure continues unremedied for a period of 30 days. If an event of default occurs under either series as a result of the non-payment of interest, either the trustee under the applicable indenture by notice to the Issuers or holders of at least 25% in principal amount of the outstanding series by notice to the Issuers may declare the principal of, premium (which would include a prepayment premium), and accrued but unpaid interest on all of such series of notes to be due and payable. The occurrence of this event of default under either series of notes, if such series of notes is not discharged and such event of default is not cured promptly, would cause a cross-default under the Company's first lien senior secured term loans and revolving asset-based credit facility that would permit the applicable lenders to accelerate such indebtedness and terminate any applicable commitments (as applicable). Acceleration of either series of notes would respectively

cause a cross-default under the Company's other secured notes and its opioid settlement obligations that would permit the holders of such notes or the opioid trust to accelerate the applicable obligations.

The determination not to make the interest payments due June 15, 2023, under the 2028 First Lien Notes and the 2029 Second Lien Notes reflects that the Company continues to consider potential alternatives, including filing for protection under the U.S. Bankruptcy Code, but no definitive decision has been made and the Company continues to engage in discussions with various stakeholders.

190.    On this news, Mallinckrodt's ordinary share price fell $0.39 per share, or 30.95%, to close at $0.87 per share on June 15, 2023.

191.    On June 21, 2023, Mallinckrodt filed another SEC Form 8-K ("June 23 8-K") in which the Company disclosed that "[o]n June 14, 2023"—the day prior to the June 15 8-K—"the Board approved a variety of actions and programs focused on executive retention and incentive matters" in anticipation of a potential bankruptcy filing. In other words, investors learned for the first time that if the Company did ultimately file for bankruptcy, Defendants would not suffer any financial consequences for the Company's collapse. Instead, Defendants had arranged to receive monetary bonuses and equity in the Company that emerged from a second bankruptcy. Investors had not only learned the truth of the Company's inability to fulfill the First Bankruptcy Plan and operate as a going concern, but also that Defendants were insulated from any losses in connection with their failure to disclose the truth.

192.   On this news, Mallinckrodt's ordinary share price fell $0.24 per share, or 15.6%, to close at $1.29 per share on June 22, 2023.

193.   On August 23, 2023, before the market opened, Mallinckrodt announced the signing of a restructuring support agreement and an agreement to file a "prepackaged" bankruptcy. Specifically, the announcement disclosed that Mallinckrodt had:

> entered into a Restructuring Support Agreement ("RSA") with a substantial majority of each of the Company's first and second lien debtholders and the Opioid Master Disbursement Trust II (the "Trust") on the terms of a comprehensive financial restructuring plan that will reduce the Company's total funded debt by approximately $1.9 billion, increase free cash flow generation, extend maturity runway and better position the business for long-term success. The RSA also provides for, among other consideration, a final payment of $250 million to the Trust, in addition to the $450 million previously paid, to support the Trust's mission to address the U.S. opioid crisis and fund addiction treatment.

194.   On this news, the Company's ordinary share price fell $0.11 per share, or 19.2%, to close at $0.47 per share at the close of trading on August 23, 2023.

195.   Early in the morning of Monday, August 28, 2023, before markets opened, Mallinckrodt filed the Second Bankruptcy petition and trading was halted in Mallinckrodt's shares on the NYSE American. The Company's share price at the close of the prior trading day, Friday, August 25, 2023, was $0.34 per share. Accordingly, the Company's shares lost all their value, and were worthless.

## ADDITIONAL SCIENTER ALLEGATIONS

196.   As set forth above, Defendants each had scienter as to the false and misleading nature of their statements because they each knew or, at a minimum, recklessly disregarded the facts described above for the following reasons.

    a.  Defendants had been closely examining the Company's financial condition in concert with investment banker Guggenheim Securities, beginning on October 1, 2022.

    b.  Defendants had engaged in a top-to-bottom strategic review from the end of 2022 into spring 2023.

    c.  From his first earnings call with investors and analysts at Mallinckrodt, Olafsson touted his prior experience working closely with Bisaro, apprising investors that their working relationship "will be deeply beneficial to our work to put Mallinckrodt on the path to long-term value creation."

    d.  Defendants educated themselves on the Company's financial condition before repeatedly assuring investors that the Company was achieving its financial goals and could operate as a going concern.

    e.  Defendants Olafsson and Reasons signed SOX certifications attached to SEC filings that they knew contained material misstatements.

197.   In addition to the above allegations, which on their own create a strong inference of scienter, additional factors support a strong inference of Defendants' scienter, including: (i) the losses each Defendant would experience if the stock options they were awarded at the end of the First Bankruptcy were extinguished if the Company filed for bankruptcy too quickly after it emerged from the First Bankruptcy, when creditors were unlikely to reward Defendants for steering the Company back into bankruptcy so quickly; (ii) Defendants needed to keep the truth

from emerging for at least 180 days to avoid the potential of revocation of approval of the First Bankruptcy Plan pursuant to 11 U.S.C. § 1144; (iii) Defendants Olafsson, Reasons, and Bisaro's high-level positions within Mallinckrodt; and (iv) that the misstatements and omissions of material facts concern the Company's core operations, about which Defendants were repeatedly questioned and spoke on.

A. **Defendants' Substantial Holdings of Mallinckrodt Stock**

198.   Each Defendant's scienter is also evident from the shockingly large losses they could avoid by concealing the truth about Mallinckrodt's ability to fulfill the First Bankruptcy Plan and continue operating as a going concern. For example, based on Mallinckrodt's 2023 proxy statement, Olafsson received a grant of 450,545 shares worth $4,580,263, Reasons received a grant of 225,273 shares worth $2,290,137, and Bisaro beneficially owned 5,000 shares in the Company. These holdings made up the vast majority of Olafsson's and Reasons's compensation. According to the same proxy, in 2022 Olafsson's base salary was $1.1 million, Reasons' base salary was $600,000.

199.   If Mallinckrodt filed for bankruptcy before these shares vested and/or were sold, however, the shares were worthless, and Olafsson and Reasons thus ***stood to lose approximately 80% of their anticipated compensation***. Defendants thus were heavily incentivized to "keep the plates spinning," *i.e.*, to assure investors that the Company was operating successfully, able to fulfill the First Bankruptcy Plan,

and not in danger of filing for bankruptcy, until they could find a way to replace the equity interests that would be obliterated if the Company filed the Second Bankruptcy.

### B. Defendants' High-Level Positions Within Mallinckrodt

200.   Defendants Olafsson, Reasons, and Bisaro each knew of the false and misleading nature of the statements discussed above, or at a minimum was reckless for not knowing these matters.

201.   Defendant Olafsson served as a Mallinckrodt director and its CEO at all relevant times during the Class Period. Mallinckrodt identified Olafsson as an "Executive Officer" of the Company during the Class Period.

202.   Defendant Reasons was the Executive Vice President and CFO of Mallinckrodt at all relevant times during the Class Period. Mallinckrodt identified Reasons as an "Executive Officer" of the Company during the Class Period.

203.   Defendant Bisaro was Chairman of the Board of Directors of Mallinckrodt at all relevant times during the Class Period.

204.   As Mallinckrodt's CEO and as a director of the Company, Defendant Olafsson, as a result of the extensive work he conducted into as part of the process of emerging from the First Bankruptcy, was privy to all material information concerning the Company's ability to fulfill the First Bankruptcy Plan and continue operating as a going concern.

205.   As Mallinckrodt's CFO, Defendant Reasons, as a result of the extensive work he conducted into as part of the process of emerging from the First Bankruptcy, was privy to all material information concerning the Company's ability to fulfill the First Bankruptcy Plan and continue operating as a going concern.

206.   As Mallinckrodt's Chairman of the Board, Defendant Bisaro as a result of the extensive work he conducted into as part of the process of emerging from the First Bankruptcy, was privy to all material information concerning the Company's ability to fulfill the First Bankruptcy Plan and continue operating as a going concern.

## C. **Importance of Fulfilling the First Bankruptcy Plan and Continuing to Operate as a Going Concern to Mallinckrodt**

207.   The fraud alleged herein relates to the core business and operations of Mallinckrodt so knowledge of the fraud may be imputed to Defendants. Defendants took their positions as CEO, CFO, and Chairman of the Board, respectively, as Mallinckrodt emerged from the First Bankruptcy. Mallinckrodt's very existence depended on its ability to fulfill the First Bankruptcy Plan and operate as a going concern with over $5 billion in debt and nearly $2 billion in settlement payments. As set forth above, Defendants commented consistently throughout the Class Period on the Company's Financial Condition and ability to operate as a going concern. It would thus be absurd to suggest that Defendants were not informed as to the Company's ability to fulfill the First Bankruptcy Plan and operate as a going concern, and, accordingly, it is appropriate to presume that Defendants were

apprised of, had access to, or had actual knowledge of all material information related to Mallinckrodt during the Class Period, including the material information that was improperly withheld and/or misrepresented to investors.

208.   Further, by virtue of their receipt of information reflecting the true facts regarding Mallinckrodt's operations and its marketplace, as well as their control over and/or receipt of the Company's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Mallinckrodt, Defendants were active and culpable participants in the fraudulent scheme alleged herein. Defendants knew of and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public. The fraud as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including Defendants.

## **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

209.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Mallinckrodt securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families

and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

210.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Mallinckrodt securities were actively traded on the NYSE and OTC.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Mallinckrodt or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

211.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

212.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

213.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Mallinckrodt;

- whether Defendants caused Mallinckrodt to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Mallinckrodt securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

214.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

215.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, in that:

82

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Mallinckrodt securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and OTC and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Mallinckrodt securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

216.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

217.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

## (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

218.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

219.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

220.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Mallinckrodt securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Mallinckrodt securities and options at artificially inflated prices.  In furtherance of this unlawful scheme,

plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

221.   Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Mallinckrodt securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Mallinckrodt's finances and business prospects.

222.   By virtue of their positions at Mallinckrodt, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

223.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Mallinckrodt, Defendants had knowledge of the details of Mallinckrodt's internal affairs.

224.   Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the statements of Mallinckrodt. As officers and/or directors of a publicly-held company, Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Mallinckrodt's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Mallinckrodt securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Mallinckrodt's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Mallinckrodt securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

225.    During the Class Period, Mallinckrodt securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Mallinckrodt securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Mallinckrodt securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Mallinckrodt securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

226.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

227.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during

the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

## (Violations of Section 20(a) of the Exchange Act Against Defendants)

228.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

229.   During the Class Period, Defendants participated in the operation and management of Mallinckrodt, and conducted and participated, directly and indirectly, in the conduct of Mallinckrodt's business affairs.  Because of their senior positions, they knew the adverse non-public information about Mallinckrodt's misstatement of income and expenses and false financial statements.

230.   As officers and/or directors of a publicly owned company, Defendants had a duty to disseminate accurate and truthful information with respect to Mallinckrodt's financial condition and results of operations, and to correct promptly any public statements issued by Mallinckrodt which had become materially false or misleading.

231.   Because of their positions of control and authority as senior officers, Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Mallinckrodt disseminated in the marketplace during the Class Period concerning Mallinckrodt's results of operations.

Throughout the Class Period, Defendants exercised their power and authority to cause Mallinckrodt to engage in the wrongful acts complained of herein. Defendants, therefore, were "controlling persons" of Mallinckrodt within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Mallinckrodt securities.

232.  Each of Defendants, therefore, acted as a controlling person of Mallinckrodt.  By reason of their senior management positions and/or being directors of Mallinckrodt, each of Defendants had the power to direct the actions of, and exercised the same to cause, Mallinckrodt to engage in the unlawful acts and conduct complained of herein. Each of Defendants exercised control over the general operations of Mallinckrodt and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

233.  By reason of the above conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Mallinckrodt.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated:  December 26, 2023                Respectfully submitted,

**POMERANTZ LLP**

*/s/ Brian Calandra*
Brian Calandra
Jeremy A. Lieberman
(admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
bcalandra@pomlaw.com
jalieberman@pomlaw.com

**DJS LAW GROUP LLP**

David J. Schwartz
274 White Plains Road, Suite 1
Eastchester, New York 10709
Telephone: (914) 206-9742
david@djslawllp.com

*Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 26, 2023, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which sent

notification of such filing to all attorneys of record.


*/s/ Brian Calandra*
Brian Calandra