**POMERANTZ LLP**
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
bcalandra@pomlaw.com

*Attorney for Plaintiffs*

*- additional counsel on signature page -*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CONTINENTAL GENERAL INSURANCE COMPANY and PERCY ROCKDALE, LLC, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> SIGURDUR OLAFSSON, BRYAN M. REASONS, and PAUL BISARO, <br><br> Defendants. | Case No. 3:23-cv-03662 |

## MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS
## THE CONSOLIDATED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ................................................................ 1

II.    STATEMENT OF FACTS ..................................................................... 5

    A.    Mallinckrodt's Misconduct Culminates in the First Bankruptcy ......... 5

    B.    The First Bankruptcy and the First Bankruptcy Plan .......................... 5

    C.    Defendants Tout Mallinckrodt's Condition and Operations ................ 6

    D.    Mallinckrodt Files the Second Bankruptcy ......................................... 9

    E.    Defendants Knew or Recklessly Disregarded that their Touts of the Company's Condition and Operations were Misleading ............. 11

III.    ARGUMENT ...................................................................................... 14

    A.    THE CC PLEADS ACTIONABLE MISSTATEMENTS .................. 15

        1.    Defendants Repeatedly Misrepresented Mallinckrodt's Condition Upon Emerging from the First Bankruptcy ............ 15

        2.    Defendants Misrepresented Mallinckrodt's Ability to Make the June 2023 $200 Million Payment to the Opioid Trusts ..... 26

        3.    Defendants Misrepresented Mallinckrodt's Risk of Returning to Bankruptcy ....................................................... 28

        4.    Defendants' SOX Certifications Are Actionable .................... 30

    B.    THE CC PLEADS A STRONG INFERENCE OF SCIENTER ....... 30

        1.    Conscious Misbehavior and Recklessness.............................. 31

        2.    Olafsson and Reasons's Motive for Fraud.............................. 35

        3.    The CC Alleges Corporate Scienter........................................ 37

        4.    The Core Operations Doctrine Contributes to a Strong Inference of Defendants' Scienter ......................................... 38

        5.    Viewed Holistically, The Inference of Defendants' Scienter is at Least As Compelling as Any Competing Inference ......... 39

    C.    THE CC STATES SECTION 20(a) "CONTROL PERSON" CLAIMS ............................................................................................ 40

IV.    CONCLUSION .................................................................................. 40

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny Cnty. Emps' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021)........................................................25, 26

*Aviva Partners LLC v. Exide Techs.*,
2007 WL 789083 (D.N.J. Mar. 13, 2007) ......................................................16

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
2019 WL 3451523 (D.N.J. July 31, 2019) ......................................................31

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023) ...........................................................................25

*De Vito v. Liquid Holdings Grp., Inc.*,
2018 WL 6891832 (D.N.J. Dec. 31, 2018)......................................................23

*Desai v. Gen. Growth Properties, Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009)..............................................................26

*Desta v. Wins Finance Holdings Inc.*,
2018 WL 1136525 (C.D. Cal. Feb. 28, 2018) .................................................38

*Dow Corning Corp. v. BB&T Corp.*,
2010 WL 4860354 (D.N.J. Nov. 23, 2010) .....................................................33

*Emps. Ret. Sys. of Puerto Rico Elec. Power Auth. v. Conduent Inc.*,
2020 WL 3026536 (D.N.J. June 5, 2020).........................................................29

*Gargiulo v. Isolagen, Inc.*,
527 F. Supp. 2d 384 (E.D. Pa. 2007)..............................................................20

*Grayson v. Mayview State Hosp.*,
293 F.3d 103 (3d Cir. 2002), and (iii)..............................................................40

*GSC Partners CDO Fund v. Washington*,
368 F.3d 228 (3d. Cir. 2004) .........................................................................22

*In re Advance Auto Parts, Inc., Sec. Litig.*,
2020 WL 599543 (D. Del. Feb. 7, 2020)........................................................24

ii

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005) ...............................................................16

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ...........................................................................31

*In re Cell Pathways, Inc.*,
2000 WL 805221 (E.D. Pa. June 20, 2000).......................................................29

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
2018 WL 3772675 (D.N.J. Aug. 8, 2018) .........................................................40

*In re Emerson Radio Corp. Sec. Litig.*,
2005 WL 8131267 (D.N.J. Dec. 20, 2005).........................................................20

*In re: Enzymotec Sec. Litig.*,
2015 WL 8784065 (D.N.J. Dec. 15, 2015)....................................................27, 38

*In re Eros Int'l PLC Sec. Litig.*,
2021 WL 1560728 (D.N.J. Apr. 20, 2021).......................................20, 21, 23, 25

*In re Gen. Elec. Co. Sec. Litig.*,
857 F. Supp. 2d 367 (S.D.N.Y. 2012) ...............................................................34

*In re Honeywell Int'l, Inc. Sec. Litig.*,
182 F. Supp. 2d 414 (D.N.J. 2002).............................................................19, 20

*In re Horsehead Holding Corp. Sec. Litig.*,
2019 WL 1409454 (D. Del. Mar. 28, 2019) ......................................................27

*In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*,
2011 WL 3444199 (D.N.J. Aug. 8, 2011) .........................................................30

*In re Schering-Plough Corp./Enhance Sec. Litig.*,
2009 WL 2855457 (D.N.J. Sept. 2, 2009).........................................................15

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889 (S.D.N.Y. 2018)..................................................................20

*In re Stone & Webster, Inc., Sec. Litig.*,
414 F.3d 187 (1st Cir. 2005).............................................................................21

iii

*In re Synchronoss Techs., Inc. Sec. Litig.*,
  2020 WL 3118749 (D.N.J. Jun. 12, 2020)......................................................10, 37

*In re Toronto-Dominion Bank Securities Litigation*,
  2018 WL 6381882  (D.N.J., 2018) ........................................................................35

*In re Urb. Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015) ....................................................................34

*In re Vivendi Universal, S.A.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003) ........................................................19, 35, 36

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ...........................................................21, 22, 30, 34

*John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*,
  119 F.3d 1070 (3d Cir.1997) .........................................................................29, 30

*Johnston v. HBO Film Mgmt., Inc.*
  265 F.3d 178 (3d Cir. 2001) ..................................................................................18

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011).................................................................................................30

*Nash v. Qualtrics Int'l Inc.*,
  2024 WL 231870 (D. Del. 2024).........................................................................23

*Noto v. 22nd Century Grp., Inc.*,
  650 F. Supp. 3d 33 (W.D.N.Y. 2023)..................................................................36

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
  834 F.3d 481 (3d Cir. 2016) ...............................................................................15

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)..................................................................................22, 24, 26

*Ortiz v. Canopy Growth Corp.*,
  537 F. Supp. 3d 621 (D.N.J. 2021)......................................................................23

*Patel v. Zoompass Holdings, Inc.*,
  2018 WL 10154207 (D.N.J. Aug. 8, 2018) .......................................................40

iv

*Pizzuto v. Homology Medicines, Inc.*,
  2024 WL 1436025 (D. Mass. Mar. 31, 2024) ......................................................32

*Rahman v. Kid Brands, Inc.*,
  736 F.3d 237 (3d Cir. 2013) ...............................................................................37

*Ret. Sys. v. Horizon Lines, Inc.*,
  686 F. Supp. 2d 404 (D. Del. 2009)......................................................................30

*Roofer's Pension Fund v. Papa*,
  2018 WL 3601229 (D.N.J. July 27, 2018) ...............................31, 35, 37, 38, 40

*S.E.C. v. Infinity Grp. Co.*,
  212 F.3d 180 (3d Cir. 2000) ...............................................................................39

*S.E.C. v. True N. Fin. Corp.*,
  909 F. Supp. 2d 1073 (D. Minn. 2012)................................................................36

*Sgalambo v. McKenzie*,
  739 F. Supp. 2d 453 (S.D.N.Y. 2010) .................................................................26

*Shapiro v. UJB Fin. Corp.*,
  964 F.2d 272 (3d Cir. 1992) ...............................................................................23

*Skiadas v. Acer Therapeutics Inc.*,
  2020 WL 3268495 (S.D.N.Y. June 16, 2020) .....................................................37

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008).............................................................................................15

*Sun v. Han*,
  2015 WL 9304542 (D.N.J. Dec. 21, 2015)...........................................................37

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)...............................................................30, 31, 35, 39

*Tomaszewski v. Trevena, Inc.*,
  482 F. Supp. 3d 317 (E.D. Pa. 2020)..................................................................40

*Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*,
  176 F. Supp. 3d 387 (D. Del. 2016)...........................................................35, 36

*Williams v. Globus Med., Inc.*,
   869 F.3d 235 (3d Cir. 2017) ........................................................................16, 18

**Statutes**

Securities Exchange Act of 1934 ............................................................................1

**Rules**

17 C.R.F. § 240.10b-5 ............................................................................................1

Lead Plaintiffs Continental General Insurance Company and Percy Rockdale, LLC ("Plaintiffs") respectfully submit this Memorandum in Opposition to Defendants' Motion to Dismiss (ECF No. 19-1) the Consolidated Complaint (ECF. No. 17) ("CC").[1]

## I.  PRELIMINARY STATEMENT

Plaintiffs bring this securities fraud class action on behalf of all persons and entities that purchased or otherwise acquired securities of Mallinckrodt plc ("Mallinckrodt" or the "Company") between June 17, 2022 and August 25, 2023, both dates inclusive (the "Class Period"). Plaintiffs seek to recover damages incurred as a result of false and misleading statements by Mallinckrodt's CEO, Sigurdur Olafsson ("Olafsson"), CFO, Bryan Reasons ("Reasons"), and Chairman of the Board, Paul Bisaro ("Bisaro") (collectively, "Defendants"), in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

Prior to the Class Period, Mallinckrodt, a pharmaceutical company, sought bankruptcy protection to get out to get out from under billions of dollars in liability related to sales of opioids and improper billing of the U.S. government for the Company's flagship product, Acthar Gel ("Acthar") (the "First Bankruptcy").

---

[1] All terms have the definitions assigned in the CC unless otherwise noted. All "¶" references are to the CC's paragraphs. "Mot." refers to the Motion; "Wuertz Decl." refers to the Declaration of Allison M. Wuertz (ECF No. 19-2).

Mallinckrodt emerged from the First Bankruptcy at the start of the Class Period. Defendants immediately began courting investors by touting that the Company was "emerging from its recent restructuring process with an attractive pipeline, *enhanced financial flexibility and significant opportunities to drive stakeholder value*" and "*well-positioned for long-term success*." These representations were critical because any equity investor needed to purchase Mallinckrodt stock knowing that its prior shareholders had been wiped out in the First Bankruptcy. They were also false. On October 1, 2022, barely three months after exiting the First Bankruptcy Defendants quietly reengaged its bankruptcy advisor, Guggenheim Securities ("Guggenheim"), to help evaluate "strategic alternatives," *i.e.*, a potential return to bankruptcy.

Defendants did not disclose the retention of Guggenheim, however, and instead continued to assure investors of Mallinckrodt's stability, health, and liquidity over the next several months. For example, Defendants emphasized that the Company was performing exactly as Defendants had forecast (*i.e.*, fulfilling its "guidance"), and even suggested that its liquidity was so strong that it could prepay portions of opioid settlements.

Defendants' assurances culminated in May 2023, when Mallinckrodt reported its first quarter 2023 financial results. Defendants touted the Company's increased cash on hand, reaffirmed their 2023 guidance, and emphasized that

2

Mallinckrodt "*remain[ed] on track to deliver on our expectation and our strategic goals*" as well as their belief "*that our sources of liquidity are adequate to fund our operations for the next twelve months and foreseeable future*." In short, nothing in Defendants' statements to investors during the Class Period suggested that the Company's results were problematic, that it could not make scheduled payments of opioid settlements, or that it was at risk of returning to bankruptcy.

These assurances, like Defendants' assurances at the start of the Class Period, were *false*. This was because although Mallinckrodt was meeting its "guidance," that guidance was *hundreds of millions of dollars* below what the Company's Chief Restructuring Officer ("CRO") had testified in the First Bankruptcy was necessary for the Company to remain solvent. In other words, the Company's liquidity was not "*adequate to fund operations*," it was a sign that Mallinckrodt could not continue as a going concern. But rather than apprise investors of the disparity between the CRO's testimony and Mallinckrodt's results, *Defendants expressly instructed investors to disregard the CRO's testimony*.

Defendants kept the truth from investors because Defendants stood to lose millions of dollars in stock grants—*approximately 80% of their anticipated compensation*—if the Company quickly reentered bankruptcy. It was not until the deadline for reentering bankruptcy under the Bankruptcy Code had expired, and Defendants arranged to obtain new equity awards, that investors learned the truth.

3

The truth began to emerge on June 2, 2023, only **three weeks** after Defendants had touted that the Company had at least a year's worth of liquidity, with a Wall Street Journal report that Defendants were considering a second bankruptcy filing (the "WSJ Article"). Mallinckrodt's share price promptly plummeted 40%. The stock continued to decline over the ensuring weeks until the Company filed a "prepackaged" chapter 11 bankruptcy petition on August 28, 2023 (the "Second Bankruptcy"), which rendered the Company's shares worthless, stiffed opioid victims, and rewarded Defendants for their misrepresentations.

The Motion argues that the CC should be dismissed because: (i) the Exchange Act did not obligate Defendants to be "pessimistic" about their business; (ii) the alleged misstatements are inactionable forward-looking statements, puffery, or opinion; and (iii) the CC fails to allege scienter. Defendants are wrong.

*First*, when Defendants elected to characterize Mallinckrodt as thriving, including, but not limited to, touting its health after the First Bankruptcy, the strength of its business plans, the fulfillment of its forecasts, and its substantial liquidity, Defendants had an obligation to make their disclosures complete and accurate, including advising investors that fulfilling performance forecasts was not a sign of health. *Second*, any forward-looking or opinion statements are actionable because Defendants knew contradictory facts and the statements lacked meaningful cautionary language. Nor are Defendants' statements puffery because they were

4

made to reassure investors about a matter of particular importance: Mallinckrodt's solvency. *Third*, the CC alleges Defendants' knowledge of facts contradicting their statements and their motive of obtaining valuable shares and other compensation as part of the Second Bankruptcy. The Motion thus should be denied in its entirety.

## II.   STATEMENT OF FACTS

### A.   Mallinckrodt's Misconduct Culminates in the First Bankruptcy

Mallinckrodt is an Irish pharmaceutical company with its principal executive offices in Dublin, Ireland, and the state of Missouri. ¶35. Mallinckrodt's misconduct in the distribution of opioids and its flagship product, Acthar Gel ("Acthar"), exposed the Company to billions of dollars in liability. ¶41. As a result, Mallinckrodt (and substantially all its U.S. then-subsidiaries) filed for bankruptcy (the "First Bankruptcy") in Delaware (the "First Bankruptcy Court"). ¶57.

### B.   The First Bankruptcy and the First Bankruptcy Plan

Mallinckrodt's proposed bankruptcy plan (the "First Bankruptcy Plan") allowed it to continue operating, reduced its debt from $5.2 billion to $3.6 billion, and wiped out shareholders. ¶¶58-60. The plan also settled opioid-related claims and claims for alleged overbilling for Acthar for approximately $2 billion. ¶¶58-60. The settlements consisted of an initial $450 million payment and annual $200 payments to opioid trusts (the "Opioid Trusts"), as well as $245 million in payments to the government over seven years. *Id.*

5

The First Bankruptcy Court held 16 days of hearings between November 2021 and January 2022 to consider the First Bankruptcy Plan. ¶62. During those hearings, Randall Eisenberg of Alix Partners ("Eisenberg"), Mallinckrodt's CRO, testified, among other things, that the plan was unlikely to be followed by another liquidation or reorganization and preserved sufficient capital for the Company to keep operating. ¶63. He based this testimony on the "First Plan Forecasts," which projected net sales for Mallinckrodt of $2.2 to $2.4 billion adjusted earnings before interest, depreciation, taxes, and amortization ("EBIDTA") of $791 million to $820 million for the years 2022 to 2025. ¶64. The First Bankruptcy Court confirmed the First Bankruptcy Plan based on Eisenberg's testimony, and the Company emerged from the First Bankruptcy on June 16, 2022 and made its first payments in connection with the opioid and Acthar settlements. *See* ¶¶65-67.

### C.    Defendants Tout Mallinckrodt's Condition and Operations

As Mallinckrodt emerged from the First Bankruptcy, Defendants were highly motivated to attract investors because 80% of their compensation was tied to Mallinckrodt's share price. ¶69. Accordingly, Defendants claimed that the Company's reorganization in the First Bankruptcy had positioned it for growth, profitability, and the creation of long-term value for its shareholders. ¶¶141-42, 144, 146, 153, 157. For example, on June 16, 2022, the Company's press release ("June 2022 Release") assured investors that "Mallinckrodt is emerging from its

6

recent restructuring process with an attractive pipeline, enhanced financial flexibility and significant opportunities to drive stakeholder value" (¶¶71, 141) and Bisaro touted that "we emerge well-positioned for long-term success, with a substantially stronger capital structure" (¶¶71, 142). Defendants affirmed these statements in an August 2022 earnings release ("Q2 Release") in which Olafsson cited the Company's "strong foundation and significant potential" and claimed that it "today benefits from significant liquidity, meaningful cash flows from operations, a solid U.S. commercial platform and competitive positioning." ¶144.

Defendants continued to characterize Mallinckrodt over the following year. *See* ¶¶153, 156-57, 163, 165, 178. On a November 8, 2022 earnings call ("Q3 Call") and accompanying release ("Q3 Release"), Olafsson highlighted that the Company "made important progress executing on our strategic initiatives," was "exactly where we said we would be last quarter," and had "the right plan in place to move forward successfully," and "a strong foundation underpinned by significant liquidity, meaningful cash flows from operations." ¶¶73, 76, 153-55, 157. He also observed that Mallinckrodt's most important product, Acthar, was performing as forecast, while Reasons touted the Company's total net sales, which "were largely in line with our expectations." ¶¶74-75.

Likewise, during the Company's February 28, 2023 earnings call ("2022 Call"), Olafsson touted that "[we] believe our liquidity will allow us to continue

7

making important investments in the business" and "we stand ready to navigate the opportunities and the challenges we have ahead of us." ¶¶78-81, 165. Later in the call, during a colloquy with an analyst, Reasons said the Company's liquidity was so strong that it could pre-pay debt, including to the Opioid Trusts. ¶¶82-83.

Defendants reiterated these sentiments two months later during a May 2023 earnings call ("Q1 Call"). Olafsson touted that Mallinckrodt "again increased [its] cash on hand" and "reaffirm[ed] [the Company's] full-year net sales and adjusted EBITDA guidance despite softer than expected Acthar performance." ¶¶86, 89. He also assured investors that "[h]aving a well diversified business allows us to manage through these challenges and remain on track to deliver on our expectation and our strategic goals." ¶¶86, 89-90, 181-82.

In sum, ***nothing*** in Defendants' statements during the Class Period indicated to investors that the Company was at risk of reentering bankruptcy or of missing its June 2023 $200 million payment to the Opioid Trusts. To the contrary, and even though they ***had hired Guggenheim—its advisor in the First Bankruptcy—in October 2022 to explore "strategic alternatives,"*** Defendants maintained that Mallinckrodt's risk of bankruptcy had passed. The Company's 2022 annual report on Form 10-K ("2022 10-K") referred to bankruptcy exclusively in the past tense, describing a "former substantial doubt about its ability to continue as a going concern" and "alleviation of the previous substantial doubt about the Company's

8

ability to continue as a going concern." ¶¶171-73. The 2022 10-K also listed multiple specific "Risks Related to [the Company's] Emergence from Bankruptcy," but said nothing about the risk of Mallinckrodt returning to bankruptcy. ¶175. Defendants supplemented these assurances by touting the Company's "increased . . . cash on hand" (¶¶124, 162, 164, 178-79) and "strengthened balance sheet and increased financial flexibility," (¶84). In fact, Mallinckrodt's Form Q1 2023 10-Q ("Q1 10-Q"), filed May 9, 2023, stated that Defendants believed the Company's "sources of liquidity are adequate to fund our operations for the next twelve months and the foreseeable future." ¶184. Further, during the Class Period Defendants assured investors that Mallinckrodt "*will*" make its June 2023 payment to the Opioid Trusts. ¶¶149-50, 159, 162, 166, 168.

### D.    Mallinckrodt Files the Second Bankruptcy

On June 2, 2023—less than a month after Defendants assurances that the Company was "on track," in a "stronger position," and had sufficient liquidity for "the foreseeable future" (¶¶89-91, 181-82, 184)—the WSJ Article revealed that Mallinckrodt could reenter bankruptcy (¶95). The Company's share price plummeted 40%. ¶96. Two weeks later, Defendants confirmed in a Form 8-K filed with the SEC ("June 15 8-K") that the Company could file for bankruptcy in the "near term" and would not make the June 2023 payment to the Opioid Trusts, and the Company's share price fell an additional 31%. ¶189.

9

On June 23, 2023, Defendants filed another 8-K ("June 23 8-K") disclosing that Mallinckrodt's Board had approved a "Key Employee Retention Plan" ("KERP"), under which officers (including Defendants) received bonuses of 150% of their base salary, as well as a "Key Employee Incentive Plan" ("KEIP"), under which officers (including Defendants) were guaranteed substantial portions of previously awarded bonuses, if they stayed with the Company after it reentered bankruptcy. ¶¶100-01. Mallinckrodt's share price declined another 15.6%. ¶192.

On August 23, 2023, Defendants announced the signing of agreements to file a "prepackaged bankruptcy" that reduced Mallinckrodt's secured debt by over 50% and payments to the Opioid Trusts to $250 million. ¶102. Mallinckrodt filed the Second Bankruptcy on August 28, 2023, and its plan reduced its stock to $0.00 and awarded creditors 90% of the reorganized Company's equity. ¶104. It also included a Management Incentive Plan ("MIP") that gave Olafsson, Reasons, and others up to 10% of the new Company's equity, worth $100 million, in addition to KERP and KEIP. Olafsson declined to participate in KERP and KEIP, but nevertheless received a pre-bankruptcy short-term incentive award of 135% of his base salary (*see* Wuertz Decl. Ex. 15) and shares worth over $10 million in connection with the MIP (*see* Calandra Decl. Ex. 2 at 33).[2]

---

[2] The Court may take judicial notice of the exhibits to the Calandra Declaration, which were filed with the SEC. *See In re Synchronoss Techs., Inc. Sec. Litig.*, 2020 WL 3118749, at *3 n.3 (D.N.J. Jun. 12, 2020).

**E.      Defendants Knew or Recklessly Disregarded that their Touts of the Company's Condition and Operations were Misleading**

Although Defendants attributed the Second Bankruptcy to "unanticipated business developments," *i.e.*, launch delays for an injection device, poor Acthar sales, and increased Acthar competition; "adverse economic conditions," *i.e.*, rising interest rates; and a "deterioration in the [Company's] financial position" in the first half of 2023, these justifications were not credible. *See* ¶¶110-11.

Acthar sales had been poor for years prior to the First Bankruptcy, Mallinckrodt had known of increasing competition since 2017, and Defendants' disclosure in early November 2022, *ten months earlier*, of the delayed injection device said did not suggest any risk to the Company's solvency. ¶¶113-17. Further, Acthar sales were *exactly what Defendants had forecast* for 2022 (¶116), and when Defendants reported declines in those sales, they emphasized that the Company's overall strength could absorb those declines (¶89). Defendants also knew of skyrocketing interest rates long before the end of the First Bankruptcy. ¶¶118-20.

These excuses for the Second Bankruptcy were also belied by Mallinckrodt's financial condition, which had markedly ***improved*** in the first half of 2023. During this time, the Company increased its cash on hand, reduced its exposure to interest rate volatility, and reaffirmed its net sales and adjusted EBIDTA guidance. ¶¶86, 88, 111, 124, 183. In fact, the Company performed *exactly* as Defendants forecast when it emerged from the First Bankruptcy,

11

meeting or exceeding its net sales and adjusted EBITDA guidance throughout the Class Period. ¶¶76-78, 86, 88, 122-24, 183. Only three weeks before the Second Bankruptcy, Defendants reported *further* increases in sales and cash on hand and reaffirmed net sales and adjusted EBITDA guidance. Calandra Decl. Ex. 1 at 5.

In short, no one believed Defendants' excuses for the Second Bankruptcy, and news reports suggested that Defendants were exploiting the bankruptcy process to reap a windfall at the expense of opioid victims. ¶137. Defendants had needed to "keep the plates spinning" before the Company reentered bankruptcy in part because under the federal bankruptcy code, Mallinckrodt effectively needed to wait at least six months before it could return to bankruptcy (¶197), and because Defendants had to negotiate a pre-packaged bankruptcy that would replenish the bonus and equity awards they stood to lose. ¶¶101-08.

Further, unbeknownst to investors, it had been impossible all along for the Company to fulfill the First Bankruptcy Plan, make payments to the Opioid Trusts, or avoid reentering bankruptcy because by only fulling its guidance (which Defendants had mischaracterized as a sign of success), the Company was not making enough revenue to remain solvent.

The First Plan Forecasts stated that the Company needed to reach annual net sales of $2.2 billion to $2.4 billion and adjusted EBITDA of $791 million to $820 million to remain solvent. ¶127. In August 2022, however, Defendants had forecast

12

net sales for 2022 of only $1.875 billion to $1.925 billion and adjusted EBITDA of $630 million and $660 million. ¶¶122-23, 129. Similarly, in the 2022 Release, Defendants had forecast net sales of only $1.700 billion to $1.820 billion and adjusted EBITDA of $510 million to $560 million for 2023. ¶¶178, 181, 183; Calandra Decl. Ex. 1 at 5. This guidance *was hundreds of millions of dollars below the First Plan Forecasts*. *See* ¶127.

In short, even though Mallinckrodt was performing as Defendants predicted, it did not have a "clear path forward" (¶¶145, 147) or "strong future ahead" (¶157), nor was it "well-positioned to stabilize the business" (¶162) or "on track to deliver on our expectation and our strategic goals" (¶181). Rather, it was certain to reenter bankruptcy and *wipe out shareholders*. Defendants never disclosed to investors that if the Company performed as expected it would be insolvent, unable to make payments to the Opioid Trusts, and reentering bankruptcy. ¶129. Instead, they instructed investors to ignore the First Plan Forecasts. ¶130.

Filings in the Second Bankruptcy confirmed that Defendants knew or recklessly disregarded the falsity of their statements during the Class Period. ¶¶133-38. For example, according to filings in the Second Bankruptcy, Olafsson and Reasons had been "working closely" with Guggenheim *since October 1, 2022* on, among other things, an evaluation of the Company's ability to operate as a going concern, which culminated in the Second Bankruptcy. ¶¶133-34.

13

Further, according to a declaration by Mallinckrodt's Executive Vice President and Chief Strategy and Restructuring Officer, Jason Goodson ("Goodson Declaration"), which was submitted in connection with the Second Bankruptcy, at essentially the time Defendants were assuring investors that Mallinckrodt could prepay amounts owed to the Opioid Trusts, "***remain[ed] on track*** to deliver on our expectation and our strategic goals," and had liquidity to operate "***for the foreseeable future***," the Company was "presently insolvent."[3] ¶¶83, 89, 91. The Goodson Declaration further stated that, by spring 2023, because of concerns about the Company's financial condition, Defendants were trying to renegotiate debt obligations, which meant that, at least prior to the statements made on May 9, 2023, Defendants knew that the Company could not pay the Opioid Trusts.

With their investment wiped out because of Defendants' knowing or reckless misrepresentations, Plaintiffs initiated this action.

### III.   ARGUMENT

"When ruling on a motion to dismiss under Rule 12(b)(6), a court must accept as true all [factual] allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable

---

[3] CC paragraphs 91 and 184 of contain a typo in quoting the Goodson Declaration. The quotation in the last sentence of the paragraph should read, "the Company was 'presently insolvent'. . ." not "'the Company was presently insolvent.'" As described in Section III.B.1 *infra*, this typo does not alter the allegation's import.

to the plaintiff."[4] *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 489 (3d Cir. 2016). Under the Private Securities Litigation Reform Act ("PSLRA"), Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . state with particularity all facts on which that belief is formed." *OFI*, 834 F.3d at 490. Importantly, the "standard is relaxed somewhat, where the factual information is peculiarly within the defendants' knowledge or control." *In re Schering-Plough Corp./Enhance Sec. Litig.*, 2009 WL 2855457, at *2 (D.N.J. Sept. 2, 2009).

To state securities fraud claim, Plaintiffs must allege: (1) a material misrepresentation or omission (falsity); (2) connected to a purchase or sale of securities; (3) scienter; (4) reliance; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). The Motion challenges the sufficiency of the CC's falsity and scienter allegations.

## A.     THE CC PLEADS ACTIONABLE MISSTATEMENTS

### 1.     Defendants Repeatedly Misrepresented Mallinckrodt's Condition Upon Emerging from the First Bankruptcy

From the time Mallinckrodt emerged from the First Bankruptcy up until the WSJ Article, Defendants touted the Company's health (¶¶141-42, 144, 146, 155,

---

[4] Emphasis is added to, and internal citations, quotation marks, ellipses and brackets are omitted from, quoted material unless otherwise indicated.

15

157, 162), strength of business plan (¶¶144-45, 147, 154), fulfillment of business plans and guidance (¶¶153, 156-57, 163, 165, 178, 181-83), and liquidity (¶¶144, 157, 162, 164, 178-80, 184). These statements were materially false and misleading, however, because (i) "once a company has chosen to speak on an issue . . . it cannot omit material facts related to that issue so as to make its disclosure misleading," *see Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017), and (ii) they "affirmatively creat[ed] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]," *see In re Alstom SA*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005). As set forth below, this is exactly what Defendants did by making their alleged misstatements.

When Mallinckrodt emerged from the First Bankruptcy, for example, Olafsson and Bisaro assured investors that the Company had "enhanced financial flexibility and significant opportunities to drive stakeholder value," and was "well-positioned for long-term success." ¶¶141-42. Defendants also stated—reiterated throughout the Class Period—that the Company had a "strong foundation" (¶¶144, 157), "ability to create value," (¶146), and "strong future" (¶¶147, 155).

These statements were misleading, however, because these statements falsely communicated to investors that "reorganization in bankruptcy had positioned [Mallinckrodt] for growth, profitability and the creation of longterm value." *See Aviva Partners LLC v. Exide Techs.*, 2007 WL 789083, at *16 (D.N.J.

16

Mar. 13, 2007). In reality, the Company's guidance and actual income were hundreds of millions of below what it needed to survive (¶¶125-30) and service its debt (¶135). Indeed, according to the Goodson Declaration, when Defendants said Mallinckrodt was "well-positioned to stabilize the business in the near term" (¶162), it was essentially insolvent (*see* ¶¶91, 135, 184; Section III.B.1 *infra*).

Similarly, Defendants misrepresented that "[w]e're confident that by executing on our plans, we can create long-term value for our stakeholders" (¶144) and that the Company had a "clear path forward" (¶145), was "well equipped to meet" challenges (¶147), and had "the right plan in place to move forward successfully" (¶154). These statements were false and misleading because they failed to disclose the gap between what the Company needed to survive and its guidance and actual income, and the risks presented by that gap. ¶¶125-30.

Defendants further misled investors by touting that the Company was successfully executing their plans and performing consistent with guidance. On the Q3 Call, Defendants boasted that "We're exactly where we said we would be last quarter and expect to deliver on our guidance for the full year. By executing on near term priorities, continuing to re-energize our organization, and delivering for stakeholders Mallinckrodt has a strong future ahead." ¶157. Defendants reiterated these sentiments on the 2022 Call (*see* ¶163), and on the Q1 Call, where Olafsson said, "our progress to date reinforces my confidence in Mallinckrodt's ability to

17

drive a long-term value" (¶181). These statements, like statements in paragraphs 153, 156, 165, 178, and 182-83, assured investors that the Company was performing as expected and thus was healthy. Defendants knew, but did not disclose, however, that the exact opposite was true, and that the Company was headed back into bankruptcy because its net sales and EBITDA were hundreds of millions of dollars below what the Company needed to survive. ¶¶125-30. Indeed, when Defendants made these statements, they were "working closely" with Guggenheim on "strategic alternatives" and desperately trying to negotiate with creditors because of the Company's poor condition. ¶¶134-35.

By assuring investors that Mallinckrodt was "well-positioned," had the "right plan in place" and was fulfilling those plans and achieving its guidance, Defendants had a duty to disclose that meeting expectations was not sufficient to keep the Company solvent.[5] *See Williams*, 869 F.3d at 241.

Finally, Defendants repeatedly assured investors that the Company had "significant liquidity" (¶157), "increased cash on hand" (¶¶162, 178-79), and funds "to continue making important investments in the business" (¶164), culminating in the disclosure in the Q1 10-Q that "our sources of liquidity are adequate to fund our operations for the next twelve months and foreseeable future" (¶184). It is

---

[5] For the same reason, they are misleading even if literally true. *See Johnston v. HBO Film Mgmt., Inc.* 265 F.3d 178, 193 (3d Cir. 2001) "[s]tatements which are technically true may be so incomplete as to be misleading").

well-established that false assurances about a company's liquidity are actionable. *See In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 169 (S.D.N.Y. 2003).

The Motion raises a panoply of arguments as to why Defendants' misstatements are not actionable, none of which are availing.

*First*, while the Motion asserts that the CC does not "identify an omitted fact that was known to Defendants" rendering the disclosures misleading (Mot. 15), Plaintiffs allege that Defendants knew, but did not disclose, that meeting expectations meant Mallinckrodt could not fulfill the First Bankruptcy Plan or stay solvent. ¶¶125-29. Nor did Defendants disclose that they had retained Guggenheim in October 2022 to explore strategic alternatives, or that they were negotiating with creditors because of solvency concerns in spring 2023. *See* ¶¶133-35.

*Second*, the Motion generally asserts (without citing a CC paragraph or analyzing any individual statement) that the Plaintiffs merely allege that Defendants "should have been more pessimistic." Not so. The CC is akin to the complaint in *In re Honeywell Int'l, Inc. Sec. Litig.*, where defendants allegedly made misstatements to "perpetuate the illusion that new Honeywell was thriving." *See* 182 F. Supp. 2d 414, 425–26 (D.N.J. 2002). Here, like *Honeywell*, the CC alleges that Defendants knew that their statements about Mallinckrodt's health (¶¶141-42, 144, 146, 155, 157, 162), business plans (¶¶144-45, 147, 154), fulfillment of plans and guidance (¶¶153, 156-57, 163, 165, 178, 181-83), and

19

liquidity (¶¶144, 157, 162, 164, 178-80, 184) were untrue. Moreover, Defendants reiterated these touts until only three weeks before the WSJ Article. ¶¶91, 95; *Honeywell*, 182 F. Supp. 2d at 425-26 ("when defendants never so much as tempered this optimism, it can be inferred that . . . it was deliberate deceit").

*Third*, Defendants' statements are not puffery. *See* Mot. at 18-19. Statements made repeatedly to reassure investors about matters of particular importance are not puffery, and nothing was more important than the Company's ability to remain solvent, given that it had just emerged from bankruptcy. ¶¶68-70. *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *12 (S.D.N.Y. 2018) (statements "to reassure the investing public" not puffery). This is so even if Defendants used the word "confident." See Mot. 18-19; *compare* ¶¶164, 180-82 (Defendants are "confident" in the Company's performance in 2023) *with In re Emerson Radio Corp. Sec. Litig.*, 2005 WL 8131267, at *12 (D.N.J. Dec. 20, 2005) (statements of "confidence" not puffery when they "identify a particular timeframe")

*Fourth*, Defendants' statements are not protected by the PSLRA's safe harbor for forward-looking statements.[6] As an initial matter, the Motion incorrectly

---

[6] The Motion does not assert that any of Defendants' alleged misstatements are protected by the safe harbor because of immateriality or no "actual knowledge" of falsity. *See Gargiulo v. Isolagen, Inc.*, 527 F. Supp. 2d 384, 388 (E.D. Pa. 2007) (defining scope of safe harbor). Accordingly, these grounds are waived. *In re Eros Int'l PLC Sec. Litig.*, 2021 WL 1560728, at *16 (D.N.J. Apr. 20, 2021). Regardless, per Section III.B.I, *infra*, Defendants knew their statements were false and the statements were material given the recent the First Bankruptcy (¶¶68-70).

states that *every* statement in 21 CC paragraphs is forward-looking. *See* Mot 18. But the Q1 10-Q's representation the Company's "sources of liquidity are adequate to fund our operations for the next twelve months and foreseeable future" (¶184), and similar statements (¶¶144, 157, 164), are not forward-looking because they misrepresent Mallinckrodt's current *liquidity*, not future *obligations*. *See In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005) (finding substantively identical statements not forward-looking). Nor is Defendants' representation that the Company "remain[s] on track to deliver on our expectation and our strategic goals" (¶181)—three weeks before the WSJ Article—forward-looking. *See Eros*, 2021 WL 1560728, at *7 (no safe harbor where "on track" is "a reflection of a current position").

Further, where a statement mixes present or past facts it "is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009). Accordingly, Defendants' statements in the following paragraphs are not forward-looking, because they (falsely) describe the present. ¶¶145, 147 ("we *have* a clear path forward"), ¶153 ("*made* important progress executing on our strategic initiatives"), ¶154 ("we *have* the right plan in place"), ¶155 ("Mallinckrodt *has* a strong future") ¶¶162 ("Mallinckrodt *is* well-positioned"), ¶¶178 ("we *increased* cash on hand . . . [and] *reaffirm[ed]* . . . 2023 guidance"), ¶183.

21

Regardless, even if these statements are treated as forward-looking, they are still actionable because they are not accompanied by cautionary language. "Cautionary language must be extensive, and specific." *Se Avaya*, 564 F.3d at 256; Use of "vague or blanket (boilerplate) disclaimer[s]" is "inadequate." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d. Cir. 2004). The cautionary language quoted in the Motion does not concern the subjects of Defendants' misstatements: the Company's health upon emerging from the First Bankruptcy, strength of its business plans, fulfillment of the plans and "guidance," or liquidity. *See* Mot. 18. The Motion also generally cites earnings call transcripts but the cautionary language in those transcripts is the very definition of vague and non-specific. *See id.* Nor are the Motion's citations to lists of cautionary statements in SEC filings apposite, as those statements warn of unexpected events and potential reasons Mallinckrodt could fail to achieve its guidance. *See id.* As alleged in the CC, the Company *achieved* its guidance, but failed to disclose that fulfilling guidance was insufficient to stay solvent, and Defendants were fully aware of supposed "unexpected" events. See ¶¶111-30.

*Fifth*, Defendants' misrepresentations are actionable whether or not they are construed as opinions. *See* Mot. 19-22. To determine whether a statement is an opinion, courts look to what "a reasonable person . . . . would naturally understand a statement to convey" when read "fairly and in context." *Omnicare, Inc. v.*

22

*Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 193-94 (2015). Here, a reasonable person would understand many of the statements Defendants assert are opinions to be statements of fact.

For example, Defendants concrete statements including verifiable facts about financial information critical to the Company's viability including liquidity, cash flow, and cash on hand, are not opinions. *E.g.*, ¶¶144, 146, 147, 153, 155, 157, 162, 164, 184; *see Nash v. Qualtrics Int'l Inc.*, 2024 WL 231870, at *3 (D. Del. 2024); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) (even general statements of financial facts such as "adequate" or "solid" are actionable); *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *7, *45 (D.N.J. Dec. 31, 2018); *Eros*, 2021 WL 1560728, at *2, *5–7 ("well-capitalized" not opinion).[7]

Nor were Defendants' statements addressing Mallinckrodt's post-bankruptcy plans opinions. The 2022 Release stated, "[w]e're confident that by executing on our plans, we can create long-term value for our stakeholders[.]" ¶144, *see,* ¶¶147, 153, 154, 155, 157, 162, 164, 165, 180-82, 184. These statements created the misimpression that the Company could remain viable by fulfilling Defendants' plans. *See De Vito*, 2018 WL 6891832, at *12 (misrepresentation where defendants hid "the truth about [the company]'s questionable status as a going concern.").

---

[7] Defendants' reliance on *Ortiz v. Canopy Growth Corp.*, is misplaced, as that case concerned "valuations of inventory and revenue," which are not at issue here. See 537 F. Supp. 3d 621, 666 (D.N.J. 2021).

23

Regardless, if Defendants' alleged misstatements are analyzed as opinions, they are still actionable. As set forth above, Defendants' statements embed core financial facts that were false and misleading, including regarding liquidity, cash on hand, and cash flow. *E.g.*, ¶¶144, 146, 147, 153, 155, 157, 162, 164, 184. While Defendants assert that placing affirmative statements of financial fact near words like "I believe" and "I think" transforms them into "pure" opinions (MTD at 20)[8], these "magic words" do not end the analysis. *See Omnicare*, 575 U.S. at 192–93.

Further, the CC alleges that Defendants had no basis to conclude that these statements were true, given that the Company's performance was hundreds of millions of dollars below what the CRO testified was necessary for the Company to remain solvent. *See In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at *4–5 (D. Del. Feb. 7, 2020) (holding actionable opinion that "we

---

[8] Defendants' argument does not extend to Defendants' many statements that lack the "magic words." ¶¶144, 146, 153, 180-82. The argument also does not extend to Defendants' statements that contain misrepresentations disconnected from any such "magic words." *See, e.g.,* ¶¶147 ("a strong foundation underpinned by significant liquidity [and] meaningful cash flows" disconnected from "I believe we are well equipped to meet [challenges ahead]"), 155 ("We're exactly where we said we would be last quarter and expect to deliver on our guidance for the full year. By executing on near term priorities . . . . Mallinckrodt has a strong future ahead" disconnected from "I want to reiterate my belief that Mallinckrodt has a strong foundation"), 162 ("we also increased cash on hand" disconnected from "we believe Mallinckrodt is well-positioned to stabilize"). Further, some statements containing "magic words" repeat identical phrases from statements without such words, and thus clearly were intended to be factual. *See, e.g.*, ¶¶146, 147, 155, 157 (repeating "meaningful liquidity" and "significant cash flows" from ¶144).

24

remain confident with the progress we're making" where executives ignored negative forecast "in favor of numbers based on an unsound methodology"). This is especially true here, where Defendants assured investors that they "believed" that the Company had sufficient liquidity for the "foreseeable future" and the WSJ Article disclosed an impending bankruptcy three weeks later. ¶¶113-24, 131; *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 693 (3d Cir. 2023) (holding "later developments may allow a reasonable inference that prior statements were untrue or misleading when made" especially when "followed shortly by corrective disclosure of significant dimension").

Nor did Defendants' statements "fairly align with information in the issuer's possession at the time," *e.g.*, the gap between the Company's performance and the First Plan Forecasts and the retention of Guggenheim. *See Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 210–12 (E.D. Pa. 2021) ("unrealistic, and ultimately impossible" estimates ignored "facts on the ground"). A reasonable investor hearing a recently bankrupt company has "significant liquidity" and "meaningful cash flow" would not infer that the Company had evidence that it was headed to bankruptcy. ¶¶144, 146, 147, 153, 155, 157, 162, 164, 184; *Eros*, 2021 WL 1560728, at *2, *5-7.

Likewise, Defendants could not have believed their statements because they knew that their current financials were below the levels required to remain viable

25

(¶¶126-30), had retained Guggenheim (¶¶133-34), and were well aware of the "unexpected" events that they claimed caused the Second Bankruptcy. ¶¶113-24. Where a defendant knows facts that make their plans "unrealistic, and ultimately impossible," there is no defense by hiding behind an "opinion." *Omnicare*, 575 U.S. 175, 184-85; *Allegheny*, 532 F. Supp. at 210-12.

### 2. Defendants Misrepresented Mallinckrodt's Ability to Make the June 2023 $200 Million Payment to the Opioid Trusts

It is well established that misrepresentations about a company's ability to meet a financial obligation actionable. *See Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 480 (S.D.N.Y. 2010) (defendants failed to disclose company's "inability to meet its obligations to [a] Joint Venture"); *Desai v. Gen. Growth Properties, Inc.*, 654 F. Supp. 2d 836, 853 (N.D. Ill. 2009) (defendants misrepresented company's ability to refinance debt). Throughout the Class Period, Defendants stated definitively that Mallinckrodt would make the $200 million payment to the Opioid Trusts in June 2023. ¶¶149, 150, 159, 168. Defendants reaffirmed this commitment in February 2023 when Reasons touted that the Company could *prepay* amounts owed to the Opioid Trusts (¶166). These statements were materially misleading because the Company could not make the payment given that its performance during the Class Period was far below what was needed to obtain the necessary liquidity (¶¶122-29), Defendants retained Guggenheim in October 2022 because of the Company's precarious financial condition (¶¶133-34), and the Company was

26

insolvent by February 2023 since its financial condition improved thereafter and it still missed the payment (section II.E *supra*; ¶¶91, 122, 135).

Defendants do not specifically address the falsity of these statements. Instead, they fold citations to these statements into a discussion of forward-looking statements that are purportedly inactionable because they are accompanied by cautionary language.[9] *See* Mot. 17-18. Cautionary language, however, "must be extensive yet specific and touch upon the subject matter of the alleged misrepresentation in order for the safe harbor to apply." *In re: Enzymotec Sec. Litig.*, 2015 WL 8784065, at *7 (D.N.J. Dec. 15, 2015). The cautionary statements cited by Defendants concern "secured indebtedness," "interest rate risk," and competition for Acthar (*see* Mot. 18),[10] not the Company's ability to make the June 2023 payment to the opioid trusts, and thus Defendants' statements are not protected by the safe harbor, *see In re Horsehead Holding Corp. Sec. Litig.*, 2019 WL 1409454, at *1 (D. Del. Mar. 28, 2019) ("purported cautionary statements failed to address. . . the specific misrepresentations and omissions at issue").

---

[9] The Motion does not contest whether these statements are inactionable under the "safe harbor" for forward-looking statements because of immateriality or a lack of "actual knowledge" of falsity, thus those issues are waived. *See* n.8 *supra*.

[10] The Motion also cites to boilerplate lists of cautionary language in 8-Ks and non-specific allusion to cautionary language in earnings call transcripts, but none of these lists or references discuss risks to the Company's ability to make the June 2023 payment to the Opioid Trusts. *See* Mot. 17-18.

27

### 3. Defendants Misrepresented Mallinckrodt's Risk of Returning to Bankruptcy

The CC also alleges that Defendants misled investors into believing that the Company's risk of bankruptcy was a thing of the past. See ¶¶171-73, 175. For example, the 2022 10-K described the "alleviation of the *previous* substantial doubt" and "*former* substantial doubt" about Mallinckrodt's ability to operate as a going concern, as well as identified five specific "Risks Related to the Company's Emergence from Bankruptcy" without referencing that the Company could return to bankruptcy. ¶¶171-73, 75. Read together with the 2022 Release and 2022 Call's assurances of "increased cash on hand" (¶162) and "ability to continue making important investments in the business" (¶164), not to mention the Q1 Call's similar touts of increases in cash on hand (¶¶124, 179) and the Q1 10-Q's assurance that the Company's sources of liquidity were adequate to fund the Company for the "foreseeable future," the statements in paragraphs communicated to the reasonable investor that Mallinckrodt was not at immediate risk of returning to bankruptcy.

These statements, read together and in context, were false, however, because, per the Goodson Declaration, the Company was "presently insolvent" in August 2023 even though the Company's financial condition had *improved* since February 2023. ¶¶91, 113, 124. The Company thus was insolvent by February 2023 *at the latest*, and likely much earlier. Further, Mallinckrodt was insolvent at the time of the above statements given that the Company's financial performance

28

during the Class Period—which was exactly as projected (¶¶122-23, 129)—was far below what was necessary for it to remain solvent (¶¶127); the Company been "working closely" Guggenheim—the same consultant used in the First Bankruptcy—to explore strategic alternatives as early as October 2022 (¶¶133-34); and Defendants were trying to negotiate with creditors as early as spring 2023 (¶135), *i.e.*, exactly when they were assuring investors that solvency concerns were in the past. Since Defendants' statements misrepresented the Company's risk of bankruptcy, they are actionable. Indeed, only three weeks after Defendants averred that the Company had sufficient liquidity to operate for the foreseeable future (¶179), investors learned that the Company was reentering bankruptcy. (¶187).

The Motion only refers to these statements in a brief footnote (Mot. 15 n.6) and thus waives the issue of their falsity because "arguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived." *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 (3d Cir.1997). Regardless, footnote incorrectly asserts that these statements are *per se* inactionable because they "describe[e] historical facts." *See Emps. Ret. Sys. of Puerto Rico Elec. Power Auth. v. Conduent Inc.*, 2020 WL 3026536, at *6 (D.N.J. June 5, 2020) (descriptions of "historical facts" are actionable); *In re Cell Pathways, Inc.*, 2000 WL 805221, at *9-10 & n.7 (E.D. Pa. June 20, 2000) (same). Moreover, even if the footnote is read to argue that Defendants' statements were

29

inactionable because they were literally true, it is well-settled that, where, as here, "literally accurate [statements] . . . become through their context and manner of presentation[] devices which mislead investors," the "disclosure required by the securities laws is measured not by literal truth but by the ability of the material to accurately inform rather than mislead prospective buyers." *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011).

### 4.    Defendants' SOX Certifications Are Actionable

Per Sections III.A.1-A.3 *supra*, the CC alleges that the Company's SEC filings contained actionable misstatements (¶¶149, 159, 168, 184), thus Olafsson and Reasons's SOX certifications (¶¶152, 161, 168, 171-75, 177, 186) are actionable. *See, e.g., City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 417-18 (D. Del. 2009). The Motion mentions the certifications in a footnote without analysis, waiving the issue. *See John Wyeth*, 119 F.3d at 1076.

## B.    THE CC PLEADS A STRONG INFERENCE OF SCIENTER

When evaluating scienter, a court must "accept all factual allegations in the complaint as true," *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007), and review them holistically, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011). The question is whether *all* facts alleged, "taken collectively, give rise to a strong inference of scienter," not "any individual allegation, scrutinized in isolation." *Avaya*, 564 F.3d at 267–68. The inference "need not be

30

irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible.'" *Tellabs*, 551 U.S. at 324. It need only be "cogent and at least as compelling as any opposing inference." *Id.* In other words, a tie sustains the CC. *See id.*

Scienter may be established through (i) "circumstances indicating conscious or reckless behavior by defendants" or (ii) allegations of "motive and a clear opportunity for committing the fraud." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997). Allegations of a motive are not required to plead a strong inference of scienter. See *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *18 (D.N.J. July 27, 2018). Nevertheless, the CC creates a strong inference of Defendants' scienter based on both motive and reckless.

### 1.    Conscious Misbehavior and Recklessness

The CC alleges conscious or reckless behavior, including Defendants' knowledge of or access to information contradicting their public statements, *i.e.*, that Defendants "knew or, *more importantly, should have known* that they were misrepresenting material facts.'" *See Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at *13 (D.N.J. July 31, 2019), at *13.

*First*, Defendants touted Mallinckrodt's financial condition, ability to "create long term value," and liquidity from the day it emerged from the First Bankruptcy to three weeks before the WSJ Article. *E.g.*, ¶¶141-47, 153-57, 163-65, 178-83. At a minimum, Defendants made these statements recklessly disregarded

31

their statements' falsity because they knew that Mallinckrodt's guidance was hundreds of millions of dollars below what their CRO testified was necessary to remain solvent. ¶¶121-29. Further, as the Company fulfilled that guidance during the Class Period, and thus was not generating sufficient revenue, Defendants **told investors to disregard the CRO's testimony**. *See* ¶130. It is hard to imagine behavior more reckless that telling investors to ignore information that could have revealed the truth. *E.g.*, *Pizzuto v. Homology Medicines, Inc.*, 2024 WL 1436025, at \*10 (D. Mass. Mar. 31, 2024) (telling press to ignore partial revelation of truth supports scienter). Knowing that there is no innocent explanation for these allegations, and the Motion does not address them.[11] *See* Mot. 23-28.

*Second*, the Goodson Declaration and other filings demonstrate that the Company was insolvent by at least February 2023. *See* ¶¶91, 135, 184. The declaration, filed in August 2023, stated that the Company had been exploring "strategic alternatives," *i.e.*, was unable to meet its financial obligations, since spring 2023 and was "presently insolvent comparing its value as a going concern to the face amount of its debt and settlement obligations." *See id.* If Mallinckrodt was "presently" insolvent in August 2023, then it was insolvent in February 2023 given

---

[11] The Motion notes that Company's 2022 and 2023 guidance also was below guidance from the First Bankruptcy. *See* Mot. at 6. This *strengthens* an inference of scienter, however, because Defendants never told investors that the 2022 and 2023 guidance was *lowering* prior guidance. Instead, the 2022 10-K told investors to *ignore* forecasts (including prior guidance) from the First Bankruptcy. *See* ¶130.

32

that that the Company's financial condition ***improved*** during that time, including increasing cash on hand, reducing interest rate exposure, aligning with guidance, no debt defaults, and sufficient liquidity (*see* ¶¶77, 79, 84, 86, 91, 124, 162, 178-79, 183-84; Calandra Decl. Ex. 1 at 5). The Motion does not address the gravamen of this allegation, and instead focuses on an immaterial typo.[12] Mot. 24-25.

The Motion does assert that "nothing in Mr. Goodson's declaration (or other documents filed in connection with the 2023 Bankruptcy for that matter) suggest[s]" insolvency, *id.*, but this is contradicted by Mallinckrodt's undisclosed retention of Guggenheim on October 1, 2022,[13] only three months after the First Bankruptcy and early in the Class Period.[14] *See* ¶¶133-34.

*Third*, on May 9, 2023, Defendants touted that Mallinckrodt had "increased cash on hand" (¶86), "remain[ed] on track to deliver on our expectation and our strategic goals" (¶89) and had sufficient liquidity "for the next twelve months and

---

[12] Defendants harp on a misplaced quotation mark in paragraphs 91 and 184. *See* Mot. 24-25. As set forth in note 4 *supra*, the quotation mark should appear before "presently," instead of "the Company."

[13] The Motion's assertion that retaining Guggenheim was just the Companying "periodically retain[ing] investment bankers to advise the Company on any number of issues" (Mot. 25-26) strains credulity given that Guggenheim was the Company's consultant in the First Bankruptcy and its work culminated in the Second Bankruptcy (¶¶133-34). At most Defendants raise a fact dispute. *See Dow Corning Corp. v. BB&T Corp.*, 2010 WL 4860354, at *12 (D.N.J. Nov. 23, 2010).

[14] Defendants' undisclosed attempts to renegotiate debt in spring 2023—when the Company's condition was improving—suggest insolvency as well. ¶134.

33

foreseeable future" (¶91). Only three weeks later, however, the WSJ article disclosed that the Company was headed back into bankruptcy. The short time period and magnitude of the change from stability to insolvency strengthens an inference of scienter. *See Avaya,* 564 F.3d at 271 (scienter alleged where temporal proximity and magnitude of change "strengthens the inference of scienter").

*Fourth*, Defendants repeatedly spoke about the precise issues implicated by the fraud, including the Company's health after the First Bankruptcy (¶¶141-42), plans (¶¶144-47), fulfillment of plans and guidance (¶¶157, 163, 165, 178, 181-83), liquidity (¶¶144, 157, 162, 178-79, 183-84), ability to make the June 2023 payment to the opioid trusts (¶¶149-50, 159, 168), and likelihood of returning to bankruptcy (¶¶171-75), when the Company's performance was well below solvency minimums (¶¶125-30), had retained a consultant to explore strategic alternatives (¶133-34), and could not service its debt (¶135). These statements also enhance an inference of Defendants' scienter. *See, e.g., In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 397-398 (S.D.N.Y. 2012). Likewise, Reasons's misleading response to an analyst regarding Company's liquidity to prepay the Opioid Trusts represents "the most powerful evidence of scienter." ¶¶82-83, 166; *see In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015).

*Fifth*, while Olafsson and Reasons's false SOX certifications alone do not allege scienter, they bolster a scienter inference given the CC's allegations

34

showing that "at the time of certification, the defendants actually knew or at least turned a 'blind eye' to information"—*e.g.*, the gap between the CRO's testimony and the Company's guidance, the retention of Guggenheim, and Defendants' attempts to negotiate with creditors—indicating that the certifications were erroneous." *Roofer's*, 2018 WL 3601229, at \*16.

*Sixth*, contrary to the Motion, the CC does not engage in group pleading. *See* Mot. 23-24. The CC alleges which Defendant made and/or certified each misstatement and thus does not use impermissible "group pleading." *See In re Toronto-Dominion Bank Securities Litigation*, 2018 WL 6381882 at \*14 (D.N.J., 2018); *Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 176 F. Supp. 3d 387, 396 (D. Del. 2016).

### 2.    Olafsson and Reasons's Motive for Fraud

A motive of "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325, 127 S.Ct. 2499. In *Universal*, for example, the court held scienter sufficiently pled where a merger gave the defendants the opportunity to exchange "illiquid and worthless" shares in one company for valuable shares of another, as well as increase "compensation by as much as 40 percent." *See* 176 F. Supp. 3d at 396. This is what the CC alleges.

Olafsson and Reasons knew that *80%* of their compensation would vaporize if investors learned that the Company was bankrupt. ¶¶15-16, 69, 198-99.

35

Accordingly, they made misrepresentations to "kept the plates spinning" until at least six months had elapsed, and they had replaced that compensation. ¶¶197-99.

Under the MIP, Olafsson and Reasons's shares in Mallinckrodt were replaced by shares in the newly reorganized entity post-Second Bankruptcy. Calandra Decl. Ex. 2 at 33. In other words, like the defendants in *Universal*, Olafsson and Reasons made misrepresentations to exchange "illiquid and worthless" shares in one company for valuable shares of another. *See* 176 F. Supp. 3d at 396. Further, under KERP and KEIP, Reasons received bonuses of 150% of his base salary, as well as a guarantee of substantial portions of their previously awarded short- and long-term bonuses. ¶¶100-01. Olafsson opted out of KERP and KEIP but negotiated to keep his short-term incentive award. Wuertz Decl. Ex. 15.

Defendants argue that the CC alleges only "generic corporate motives." *See* Mot. 27. Although one hopes that planning to wipe out shareholders while profiting in a prepackaged bankruptcy is not "common to all corporations and executives," Plaintiffs allege a windfall in a specific transaction, *i.e.*, the Second Bankruptcy. ¶¶100-04. Misleading investors to benefit in a transaction supports scienter. *See Noto v. 22nd Century Grp., Inc.*, 650 F. Supp. 3d 33, 46 (W.D.N.Y. 2023); *S.E.C. v. True N. Fin. Corp.*, 909 F. Supp. 2d 1073, 1113 (D. Minn. 2012)

The Motion also asserts that the CC fails to explain why Defendants would lie about a Company that was doomed to fail. *See* Mot. 26-27. This argument could

36

be made in virtually every securities fraud class action. In any event, it is plausible that "Defendants rationally (though recklessly) gambled" that they could replace their compensation as part of a follow-on bankruptcy.[15] *See e.g., Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at \*11 (S.D.N.Y. June 16, 2020).

Finally, Defendants emphasize that the CC does not allege any suspicious stock sales (Mot. 28–29), but such allegations are not required to defeat a motion to dismiss. *See, e.g.*, *Roofer's*, 2018 WL 3601229, at \*18. This is particularly true here, where Defendants did not need to sell shares to profit from their fraud because they replaced their unsold shares in the prepackaged bankruptcy.

### 3. The CC Alleges Corporate Scienter

"A plaintiff can use corporate or collective scienter to plead an inference of scienter against a corporate defendant without raising the same inferences required to attribute scienter to an individual defendant." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3d Cir. 2013); *Sun v. Han*, 2015 WL 9304542, at \*12 (D.N.J. Dec. 21, 2015) (same). The CC's allegations that Guggenheim's work with senior executives on strategic alternatives beginning in October 2022 (¶¶133-34), the

---

[15] The Court cannot notice the article cited in footnote 13 of the Motion because it was neither referenced nor relied on in the CC and contains a journalist's opinions, which Plaintiffs' dispute. *See Synchronoss*, 705 F. Supp. 2d at 391 ("the opinions of analysts or reporters cannot be noticed for the truth"). If anything, the article amplifies an inference of Defendants' scienter, because it suggests Defendants knew they could replace their compensation in the Second Bankruptcy.

compensation through KERP, KEIP, and the MIP for all executives (¶¶100-05), and the short timeframe between the assurance of sufficient liquidity "for the foreseeable future" in the Q1 10-Q only three weeks before the WSJ Article (*see, e.g.*, ¶¶91, 95) "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter" *Desta v. Wins Finance Holdings Inc.*, 2018 WL 1136525, at *7 (C.D. Cal. Feb. 28, 2018).

### 4.    The Core Operations Doctrine Contributes to a Strong Inference of Defendants' Scienter

Although a court may not infer that a corporate officer "was aware of information merely by virtue of his or her position within a company," under the "core operations doctrine," where the information relates to "the organization's core business, such facts are powerful circumstantial evidence of scienter." *Roofer's*, 2018 WL 3601229, at *24. This is particularly true where misstatements concerned issues "central to the core business of the Company" about which defendants "spoke regularly." *Enzymotec*, 2015 WL 8784065, at *18.

Here, Mallinckrodt emerged from the First Bankruptcy at the start of the Class Period, the most critical issue to Defendants (and investors) was the Company's ability to continue as a going concern. *See* ¶¶69-70. Given the importance of the Company's ability to keep operating, it would be "absurd to suggest" Defendants did not know their statements' falsity.

38

### 5.   Viewed Holistically, The Inference of Defendants' Scienter is at Least As Compelling as Any Competing Inference

Scienter allegations must be considered holistically, not individually. *Tellabs*, 551 U.S. at 326. Considered holistically, the following allegations allege a strong inference of scienter: (a) Defendants' knowledge that the Company's performance was insufficient to survive and instruction to investors to disregard the CRO's testimony, (b) Defendants' retention of Guggenheim and exploration of strategic alternatives while they were reassuring investors about the Company's performance and liquidity, (c) the short interval between stating that the Company had enough liquidity for the "foreseeable future" and investors learning the Company was insolvent, (d) Olafsson and Reasons's motive, (e) Defendants' SOX certifications, and (f) the core operations doctrine.

By contrast, Defendants' proffered inference of good faith (*see* Mot. 29-30) is implausible given, among other things, that none of the developments that ostensibly caused the second bankruptcy were "unexpected" (¶¶110-24), the mammoth gap between their guidance and the First Plan Forecasts (¶¶121-25) and telling investors to disregard the First Plan Forecasts. Even if Defendants' claim of good faith was plausible—which it is *not*—"[a] good faith belief is not a 'get out of jail free card.' It will not insulate the defendants from liability if it is the result of reckless conduct." *S.E.C. v. Infinity Grp. Co.*, 212 F.3d 180, 193 (3d Cir. 2000). Further, while Defendants emphasize that the CC does not reference confidential

39

witnesses, "there is no requirement that plaintiffs in a securities fraud action support their allegations with information attributed to confidential witnesses." *Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 333–34 (E.D. Pa. 2020) (lack of confidential witnesses does not undermine scienter allegations).

## C.    THE CC STATES SECTION 20(a) "CONTROL PERSON" CLAIMS

The Motion asserts that Plaintiffs' "control person" claims fail because the CC neither alleges an underlying violation of Section 10(b) nor Defendants' "culpable participation." Mot. at 30. As set forth above, however, the CC alleges Section 10(b) violations. In addition, although "the overwhelming trend" in this circuit is to ***not*** require culpable participation, *Roofer's*, 2018 WL 3601229, at 24 n.*24, the CC alleges each Defendant's scienter and knowledge of information undermining his statements. *See* Section III.B.1, *supra*; *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *35 (D.N.J. Aug. 8, 2018).

## IV.    CONCLUSION

Plaintiffs respectfully request that the Motion be denied.[16]

---

[16] Should the Court grant the Motion in full or in part, Plaintiffs respectfully request leave to amend because (i) in the Third Circuit, "plaintiffs whose complaints fail to state a cause of action are entitled to amend their complaint unless doing so would be inequitable or futile," *id.*, (ii) there been no undue delay, bad faith, dilatory motive, or prejudice, *see Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002), and (iii) this is the first opportunity the Court address the merits of Plaintiffs' claims under the PSLRA and Rule 9(b), *see Patel v. Zoompass Holdings, Inc.*, 2018 WL 10154207, at *9 (D.N.J. Aug. 8, 2018).

Dated: May 7, 2024

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Brian Calandra*
Brian Calandra
Jeremy A. Lieberman (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email:  jalieberman@pomlaw.com
        bcalandra@pomlaw.com

**DJS LAW GROUP LLP**
David J. Schwartz
274 White Plains Road, Suite 1
Eastchester, New York 10709
Telephone: (914) 206-9742
david@djslawllp.com

*Counsel for Lead Plaintiffs Continental General Insurance Company and Percy Rockdale, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2024, I caused to be filed electronically the foregoing Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

POMERANTZ LLP

*/s/ Brian Calandra*
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
bcalandra@pomlaw.com