# EXHIBIT 20

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MALLINCKRODT PLC, *et al.*,[1] | ) | Case No. 23-11258 (JTD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 452** |

**DECLARATION OF BRENDAN HAYES IN
SUPPORT OF CONFIRMATION OF THE FIRST AMENDED PREPACKAGED
JOINT PLAN OF REORGANIZATION OF MALLINCKRODT PLC AND
ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

I, Brendan Hayes, hereby declare as follows:

1.      I am a Senior Managing Director at Guggenheim Securities, LLC ("***Guggenheim Securities***"), an investment banking firm with principal offices located at 330 Madison Avenue, New York, New York, 10017.  Guggenheim Securities is the proposed investment banker for the debtors and debtors-in-possession (collectively, the "***Debtors***") in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***").[2]

2.      I submit this declaration (this "***Declaration***") in support of confirmation of the *First Amended Prepackaged Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* dated August 23, 2023 [D.I. 452] (the "***Plan***") as modified, amended, or supplemented from time to time.[3]

---

[1]   A complete list of the Debtors in these Bankruptcy Cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt2023.  The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2]   The Debtors filed the *Application of Debtors for Entry of an Order, Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, Authorizing the Retention and Employment of Guggenheim Securities, LLC as Investment Banker to the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date, and Modifying Certain Time-Keeping Requirements* [D.I. 243] on September 13, 2023.

[3]   Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan or the Restructuring Support Agreement, as applicable.

1

3.      Although Guggenheim Securities is being compensated for its work as the investment banker retained by the Debtors, I am not being compensated separately for this testimony.  Except as otherwise indicated herein, all of the statements set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by Guggenheim Securities professionals involved in advising the Debtors in the Chapter 11 Cases, or information provided to me by the Debtors.  If called upon to testify, I could and would testify to the facts set forth herein on that basis.  I am over the age of 18 years and authorized to submit this Declaration.

## Qualifications

4.      I have been employed at Guggenheim Securities since 2018.  Prior to joining Guggenheim Securities, I was a Managing Director and partner at Millstein & Co., which sold its investment banking business to Guggenheim Securities.  Prior to joining Millstein & Co., I was in the restructuring group at Lazard Frères & Co., LLC, where I represented companies and stakeholders in restructuring and financing transactions.  Prior to working at Lazard, I worked in the leveraged finance and restructuring groups at Lehman Brothers and, subsequently, Barclays Capital.  I graduated with a B.S. in Mathematics and History from Tulane University and an M.B.A. from New York University.  I am also a Chartered Financial Analyst (CFA) charterholder.  I am a member of the Newcomb-Tulane College Dean's Advisory Council at Tulane University, a member of the Board of Education in New Canaan, CT and a member of the board of MPP, a Mill Point Capital portfolio company.

5.      I personally have over nineteen years of experience as an investment banker advising large companies and their investors.  My areas of expertise include, among other things, (a) advising on financial restructuring strategies and M&A processes including the performance of valuation-related financial analyses, (b) analyzing business plans and related financial

2

projections, (c) advising on liquidity alternatives and (d) sizing, structuring, raising and executing all aspects of financing transactions, including distressed and exit financings. I have advised companies and creditors in connection with numerous in-court and out-of-court restructurings, recapitalizations and reorganizations involving aggregate liabilities of tens of billions of dollars. My in-court representations include, among others, Caesars Entertainment Operating Company, 21st Century Oncology, NII, NewPage, and the Debtors in their chapter 11 cases filed in 2020. In almost all of these in-court engagements my work included negotiating and evaluating financing, restructuring support agreements, and restructuring transactions for debtors in possession.

6. Guggenheim Securities has been engaged as investment banker to the Debtors, and members of my team and I have been working closely with the Debtors, since October 1, 2022. Since being engaged by the Debtors, Guggenheim Securities has rendered investment banking advisory services to the Debtors in connection with, among other things, the Debtors' evaluation of their strategic alternatives. Additionally, Guggenheim Securities has worked closely with the Debtors' management and other professionals retained by the Debtors with respect to these strategic alternatives and has become acquainted with the Debtors' capital structure and business.

**<u>Negotiation of the Restructuring Support Agreement and Plan</u>**

7. In my role as investment banker to the Debtors, I assisted the Debtors, along with their other advisors, with the negotiations of the key economic terms of the Restructuring Support Agreement and the Plan. Those negotiations were conducted at arm's-length over several months, from the initial outreach by creditors to Mallinckrodt in May 2023 up until the execution of the Restructuring Support Agreement in late August 2023. During this period, the Debtors negotiated with three major groups of secured creditors as well as the Opioid Master Disbursement Trust II (the "***MDT II***").

3

8. Among secured creditors, the Ad Hoc First Lien Group Steering Committee and Ad Hoc Crossover Group Steering Committee took the lead in negotiating the terms of the Restructuring Support Agreement and Plan on behalf of the wider Ad Hoc First Lien Term Loan Group and Ad Hoc Crossover Group (comprising holders owning second-lien debt as well as first-lien debt). I am not aware of any creditor requesting to join either of these steering committees during the negotiation process and being refused access.

9. A preliminary deal on the economic terms of what would become the Restructuring Support Agreement was not reached until July 2023, nearly two months after discussions began, after in-person negotiations among the Debtors, the Ad Hoc First Lien Group Steering Committee, the Ad Hoc Crossover Group Steering Committee, and the MDT II and their respective advisors on the terms of a comprehensive restructuring of the Debtors' balance sheet. After that preliminary agreement was reached, the Debtors and the above creditor groups then negotiated and reached a preliminary agreement with the Ad Hoc 2025 Noteholder Group. Final negotiations and documenting the Restructuring Support Agreement and the various Definitive Documents thereunder took several additional weeks. The Restructuring Support Agreement was ultimately finalized in late August 2023.

10. During these extended negotiations, I understand that the members of the Ad Hoc First Lien Group Steering Committee, the Ad Hoc Crossover Group Steering Committee and the Ad Hoc 2025 Noteholder Group incurred limitations to their freedom of action. Among other things, members of these groups agreed to forbear from exercising remedies under their debt documents and were restricted from trading their positions in the debt of the Debtors. By having additional time with these creditors while restricted, the Debtors were able to negotiate the material

4

terms of the Restructuring Support Agreement and Plan. Additionally, in my experience, such trading restrictions can impose a meaningful risk on, and have a cost to, the holders.[4]

11. In addition, during the above-described negotiations, the Debtors were able to obtain concessions from each of the Ad Hoc First Lien Group Steering Committee, Ad Hoc Crossover Group Steering Committee, and Ad Hoc 2025 Noteholder Group and improve certain of the overall terms of the restructuring transactions embodied in the Restructuring Support Agreement and Plan. The Ad Hoc First Lien Group Steering Committee agreed to forgo pursuit of a sale-based restructuring and worked with the Debtors to achieve consensus across its capital structure leading to the prepackaged Plan. The Ad Hoc First Lien Group Steering Committee and Ad Hoc Crossover Group Steering Committee also agreed, among other things to: (a) forgo a proposed 3:1 roll-up of prepetition obligations into the DIP Facility; (b) backstop the DIP Facility along with other ad hoc group members; and (c) allow all qualified secured first lien creditors to join the Restructuring Support Agreement and participate in the DIP Facility (and thereby receive the interest and fees thereunder). In addition, as noted in the Disclosure Statement, the Ad Hoc 2025 Noteholder Group agreed to a prepetition dismissal, with prejudice, of pending appeals regarding the 2025 First Lien Notes Makewhole Claims, in exchange for the Forbearance and Settlement Payment and the stipulated 2025 First Lien Notes Makewhole Amount reflected in the Plan (which, I understand, itself represents a discount to the amount sought by the Ad Hoc 2025 Noteholder Group in the appeal).

12. During discussions that I observed and participated in, the Ad Hoc First Lien Group Steering Committee, Ad Hoc Crossover Group Steering Committee and Ad Hoc 2025 Noteholder

---

[4] Here, based on trading prices from Bloomberg, between June 5, 2023 (the date I understand when the Ad Hoc Crossover Group Steering Committee became restricted) and August 23, 2023 (the RSA execution date), the trading prices of the 2029 Second Lien Notes fell from approximately 38% of par value to 13% of par value and the trading prices of the 2025 Second Lien Notes fell from approximately 40% of par value to 12% of par value.

Group consistently maintained that they required consideration as a condition to entering into the Restructuring Support Agreement as compensation for their efforts and the restrictions they agreed to as described above. That consideration took the form of the Forbearance and Settlement Payment set forth in the Restructuring Support Agreement. Based on discussions I observed and participated in, I believe that the Forbearance and Settlement Payment was an integral component of the overall package of terms that constitute the comprehensive restructuring reflected in the Restructuring Support Agreement. Indeed, during these discussions that I observed and participated in, the creditors consistently maintained that they required the foregoing payment as a condition to entering into the Restructuring Support Agreement. Based on my experience, moreover, I believe that the granting of similar fees to key restructuring parties or RSA participants has been done in other cases as well.[5]

13. The Forbearance and Settlement Payment, moreover, is just one component of the comprehensive restructuring reflected in the Restructuring Support Agreement which confers numerous benefits to the Debtors and their estates. Among other things, the Restructuring Support Agreement, and specifically the participation of the aforementioned groups, permits restructuring through a "prepackaged" chapter 11 process which, in my experience, allows the Debtors to minimize the amount of time they spend in bankruptcy and, thereby, limit the adverse effect on the Debtors' businesses that a bankruptcy may give rise to, as well as the significant costs that might otherwise be borne by the Debtors' estates in a protracted chapter 11 process. In addition, the Restructuring Support Agreement and the Plan, and specifically the consent of the

---

[5] For example, the aggregate total of Forbearance and Settlement Payments made to the Steercos totaled approximately $88 million, or approximately 3.5% of the total debt holdings of the Holders receiving the payments. In the 2020-2022 Chapter 11 Cases, the debtors paid certain consent and NDA extension fees to certain members of an ad hoc unsecured noteholder group totaling approximately 2.5% of those creditors' unsecured holdings.

6

aforementioned groups, results in meaningful recoveries across the Debtors' capital structure without protracted disputes on valuation. And, the restructuring will result in a significant de-leveraging of the Debtors' balance sheet, reducing the Debtors' funded debt obligations from approximately $3.6 billion to $1.75 billion and the Debtors opioid settlement obligations from $1.275 billion to $250 million (paid prepetition).

14. In sum, based on the discussions I observed and participated in among the Debtors and the creditor groups described above and their respective advisors, I believe that the terms of the Restructuring Support Agreement and the Plan are the product of good faith and arm's-length negotiations. Additionally, based on discussions I observed and participated in as well as my experience in other restructurings, I believe that the Forbearance and Settlement Payment is an integral and inseparable component of the comprehensive restructuring embodied in the Restructuring Support Agreement and Plan.

### Management Incentive Plan

15. As noted in the Disclosure Statement, the Plan provides that, after the Effective Date, the Reorganized Board shall adopt the Management Incentive Plan. As set forth in the Plan, the Management Incentive Plan provides that equity interests may be issued to post-emergence management, key employees and directors of the Reorganized Debtors in an amount not to exceed ten percent (10%), in total, of the fully diluted New Common Stock of the Reorganized Debtors. The specific structure, grants and details of the Management Incentive Plan, however, are to be determined by the Reorganized Board in consultation with a compensation consultant that will be mutually selected by the Ad Hoc First Lien Term Loan Group and the Ad Hoc Crossover Group, as set forth in the Plan. Accordingly, as I understand, the Management Incentive Plan has not yet been implemented and none of its actual terms (other than the maximum amount of New Common Stock that may be issued thereunder) have been determined.

16.     Based on my experience as a restructuring professional, it is common for post-emergence management incentive plans to be disclosed in plans of reorganization to inform creditors that their recoveries under the plan may be diluted by later equity issuances.  It is also my experience that the implementation and terms of such management incentive plans are often, as here, left to the discretion of the governing bodies of the post-emergence debtor.

[<em>Remainder of page intentionally left blank</em>]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.


Dated:  October 2, 2023
        New York, New York

*/s/ Brendan Hayes*
Brendan Hayes
Senior Managing Director
Guggenheim Securities, LLC